Parsons, C. J.,
delivered the opinion of the Court.
After reciting the facts in the case, and observing that it might not be necessary to state the arrest, the rescue, and the subsequent embargo, which occurred after the master had discontinued his voyage to Malaga, and was returning to Salem, his honor proceeded —
A principal question in the case is, whether, on these facts, the plaintiffs can recover a total loss, arising from the restraint and *90 detention of princes insured against, it being admitted that after the notice and warning, the vessel and her cargo would have been exposed to great danger of capture and condemnation, by pursuing her voyage to Malaga.
From the facts, it is manifest that the privateer, by coming on board the barque, and by giving the notice, warning, u * 109 ] *and advice stated, did not capture her. A capture is a seizure as prize, with the intent or expectation of obtaining a condemnation. In this case, there does not appear to be any actual seizure. The barque was brought to, and examined by the privateer, as was lawful for her commander. From this examination, the vessel appears to be neutral, and bound to a port declared by his sovereign to be blockaded, of which the master had not received notice. The privateer does not then proceed to seize ner as a prize, but, after giving the master notice of the blockade, dismisses her.
Neither, from these facts, can the privateer be considered as bavng arrested, restrained, or detained the barque, so as to entitle the owner to abandon, within the intent of the policy. For in this instrument I know of no difference between the import of restraint and detention. They are respectively the effect of superior force, operating directly on the vessel. So long as a ship is under restraint, so long she is detained ; and whenever she is detained, she is under restraint. Neither have I found a book or case, relating to insurances, in which a different construction has been given to these vrards.
Now, it was lawful for the commander of .he privateer to detain the barque as a neutral vessel, for the purpose of search ; and after the search, she was discharged from this restraint. And, indeed, in considering the conduct of the privateer, as amounting either to capture, arrest, detention, or restraint, within the policy, during the search, the plaintiffs cannot prevail for that cause, as, on the termination of the search, and after the notice, warning, and advice, the barque was abandoned by the privateer to the master, who immediately had the exclusive possession of her.
It has been argued that the notice and warning, given by the privateer, is a restraint or detention of a prince, within the meaning of the policy; because the barque could not afterwards proceed to her destined port, without great danger of capture and condemnation.
[ * 110 ] * But it cannot be admitted, that information at sea to a master of a neutral vessel, that her port of destination is blockaded, is of itself a restraint or detention of the vessel; for this nformation may as well be received from another neutral vessel, as *91 from a privateer belonging to subjects of the blockading sovereign And as to the warning not to proceed to the blockaded port, it cannot be material in this question ; for the future danger of capture was not in any degree caused by the warning, but wholly by the knowledge of the blockade; for after this knowledge the barque, continuing her voyage to the blockaded port, would have been equally liable to capture and condemnation, as she would have been, had the notice only been given, and the warning to discontinue her voyage been omitted.
If, therefore, it can be concluded from these facts, that the barque has been detained or restrained by a prince, within the intention of the policy, so as to entitle the owners to abandon, that conclusion must result from the blockade of the port of her destination, by one of the belligerent sovereigns, by which she was prohibited from attempting to enter that port, on penalty of condemnation as prize of war, if captured in the attempt.
In deciding on this point, it is not necessary to inquire whether the blockade was actual, or only constructive, or whether the orders in council were, or were not, an interruption of the lawful rights of neutral commerce. These are questions which may be discussed and settled by the neutral and belligerent sovereigns. But as between the parties to a contract of insurance, the effect is the same, whether the blockade is, or is not, authorized by the laws of war; because the danger to the assured is the same, and arises from the same cause, — the act of one of the powers at war.
Every species of neutral merchandise bound to a port known to be blockaded, are goods contraband of war; and the blockading power, on seizing them, will condemn them * as prize of war, on the ground that the neutral owner [ * 111 ] has forfeited his neutral rights, by a breach of his neutral duty. If, therefore, the master of the barque, after the knowledge of the blockade of Malaga, had continued his voyage, and been captured by any British armed ship, she would have been condemned, with her cargo, as prize of war, for this supposed breach of neutrality.
To avoid this danger, which was great, the master discontinued his voyage, and returned to Salem. The voyage being thus wholly lost, the assured, on seasonably offering to abandon, claim a total loss. This claim is resisted by the assurers, on the ground that the voyage was not lost by any of the perils insured against; that the insurance did not cover a voyage to a blockaded port; and that if they had insured a cargo on such a voyage, the voyage would have been illegal, and the policy would have been void.
Several points are involved this defence, which deserve atten *92 tion: we will first consider the supposed nullity of a policy, arising, as it is said, from insuring goods on illicit voyages.
Illicit voyages may be ranked in several classes, some of which we will mention.
When the sovereign of the country to which the ship belongs, shall prohibit his subjects from trading with a foreign country or port, whether the prohibition be a consequence of his declaring war against the foreign country, or be made by an express ordinance for any cause at the will of the sovereign, a voyage to that country for the purpose of trade is illicit, and all insurances on such voyages by his subjects are void, whether the assurers had, or had not, knowledge of the prohibition. For the law will not allow any effect to a contract made to protect a traffic which it has prohibited. A prohibition of this kind is considered by Emerigon, c. 12, <§> 31, vol. i. 542, under the head of “ Interdiction of Commerce.”
[*112] * Another class of illicit voyages are those which are prohibited by the trade laws of a foreign, state, whether those laws wholly exclude the merchant ships of other states from its ports, or only prohibit the importation or exportation of particular species of goods. Because the municipal laws of any state have not the force of laws without its jurisdiction, voyages prohibited in one state are not in any other state deemed for that reason to be illegal. These voyages may, therefore, be the subjects of insurance in any state in which they are not prohibited. And if the assurer will expressly insure against seizure for illicit trade, or if, with a full knowledge of the nature of the voyage, he will insure it without making any exception, he will be bound to indemnify the assured for the losses arising from the breaches of the trade laws of the foreign state. But although he may not take upon himself these losses, and thus be irresponsible for them, yet he is answerable for any other losses insured against, because the policy is not void.
The last class we shall mention is the transportation by a neutral of goods contraband of war to the country of either of the belligerent powers. And here it is said that these voyages are prohibited by the law of nations, which forms a part of the municipal law of every state, and, consequently, that an insurance on such voyages, made in a neutral state, is prohibited by the laws of that state, and therefore, as in the case of an insurance on interdicted commerce, is void.
That there are certain laws, which form a part of the municipal .aws of all civilized states, regulating their mutual intercourse and duties, and thence called the law of nations, must be admitted ; as, for instance, the law of nations affecting the rights and the security of ambassadors. But we do not consider the law of nations, as *93 certaining whai voyages or merchandise are contraband of war, as having the same extent and effect. It is agreed by every civilized state, that if the subject of a neutral power shall attempt to furnish either of the belligerent sovereigns with goods * contraband of war, the other may rightfully seize and [* 113] condemn them as prize. But we do not know of any rule, established by the law of nations, that the neutral shipper of goods contraband of war is an offender against his own sovereign, and liable to be punwhed by the municipal laws of his own country. (6)
When a neutral sovereign is notified of a declaration of war, he may, and usually does, notify his subjects of it, with orders to decline all contraband trade with the nations at war, declaring that if they are taken in it, he cannot protect them, but not announcing the trade as a violation ot his own laws. Should their sovereign offer to protect them, his conduct would be incompatible with his neutrality. And as, on ihe one hand, he cannot complain of the confiscation of his subjects’ goods, so, on the other, the power at war does not impute to him these practices of his subjects. A neutral merchant is not obliged to regard the state of war between other nations; but if he ships goods prohibited jure belli, they may be rightfully seized and condemned. It is one of the cases where two conflicting rights may exist, which either party may exercise, without charging the other with doing wrong. As the transportation is not prohibited by the laws of the neutral sovereign, his subject may lawfully be concerned in it; and as the right of war authorizes a belligerent power to seize and condemn the goods, he may rightfully do it.
We will mention one other case. A neutral ship may lawfully be laden with the property of one of the hostile powers; but the other may seize her, carry her into port, and lawfully take from the ship his enemy’s goods. Here are conflicting rights, which are admitted by the power who shall seize; for he will pay the neutral his freight, when he acts fairly, attempting no improper concealment.
But we know of no case where the neutral merchant has been punished by his own sovereign for his contraband shipments. If he will adventure on the trade, and his effects are seized and condemned as prize, — to this penalty * he must sub- [ * 114 ] mit, for his sovereign will not interfere, because the capture was lawful. And it may be further observed, that if the exportation of contraband goods, from a neutral country to a port of either of the powers at war, is a trade which, from its nature, is *94 prohibited by the laws of the neutral sovereign, then the policy on such goods would be void, and the assurer would be exempted from any loss or damage arising even from the danger of the sea. But an exemption of this kind is not founded on any sound principle, nor is it supported by any usage.
We do not, therefore, discover any just distinction between an interloping trade in a foreign port, illicit lege loci, and a trade in transporting contraband goods, which is illicit jure belli, so far as either may be an object of insurance by neutrals in a neutral country. And we are satisfied that an insurance, effected in the country of a neutral prince, by his subjects, against capture and condemnation of their goods, because they are contraband of war, is not prohibited by his laws, merely because the capture and condemnation are justified by the laws of war. But if goods contraband of war are on cargo, the assurer is not responsible for their capture and condemnation on that account, unless, either with a full knowledge of the nature of the goods, and of the voyage, or by an express undertaking, he shall insure them against such capture. So an insurer is not answerable for a seizure and confiscation of goods, for the violation of the trade laws of a foreign port, unless, with a full knowledge of the trade, or by an express undertaking, he shall insure them against such seizure. But in both cases, where no such special insurance is made, the policy is not void because the ship is bound on an interloping or contraband voyage, but the as-surer will be answerable for the other risks, against which he has insured.
Goods contraband of war are of two descriptions — munitions of war, the property of a neutral, bound from a neutral port to the territory of either of the belligerents, after the existence [*115] of the war is known; and every species * of neutral goods, bound from a neutral port to a port belonging to either of the powers at war, and known to be blockaded by the other power. The principle, therefore, on which a belligerent will capture and condemn as prize the goods of a neutral, bound to a port known by him to be blockaded, arises from the consideration, that all such goods are contraband of war.
We will consider the first description of contraband goods. If, after the war is known to exist, a ship, laden wholly or in part with munitions of war, is insured to the country of one of the powers at war, and the assurer has not assured against capture for contraband trade, the policy would not be void, but the assurer would not be holden for a loss by condemnation on account of the contraband goods. So, if the country to which the ship was destined engaged in war after the commencement of the voyage, the policy would *95 not be void ; but if the master, after notice of hostilities, continued his voyage, and was condemned for being bound to a port of one of the belligerent nations, with munitions of war on board, the assurer would not be liable, because he did not insure against a capture for that cause. This case is not distinguishable from a voyage prohibited by the trade laws of a foreign port. If new regulations, made during the voyage, should render the trade illicit, and the master, on his arrival, should violate those regulations, and for that cause the property insured should be confiscated, the as-surer will not be answerable, unless he had insured against seizure for illicit trade. But if he had, he would be holden for the loss, whether the trade became illicit before or after the commencement of the voyage.
It has, however, been supposed that there is a difference between the cases; for the loss in the former case arose by condemnation jure belli; and it is a rule, that a declaration of war, or a treaty of peace, made after the commencement of the risk, does not vary the rights or the obligations of the parties to the policy.
*This position is generally true, although it is not [*116] correct when a war shall happen between the nation to which the ship belongs, and the nation to whose port the voyage is insured ; for on this event being known to the parties, the voyage becomes illegal, being interdicted by the laws of the country to which the ship belongs.
But it is unnecessary now to discuss the nature and extent of this exception.
The effect of the rule, when it is applicable, is, that each party is bound by the contract, whether the perils insured against become greater or less, by war or peace. The rule, therefore, extends only to the degree of hazard, but not to the nature of the peril. For by the breaking out of the war, the assurer becomes liable for no perils, which he had not insured against, although the perils insured against may have become much greater by this event.
The other description of goods contraband of war includes all neutral merchandise bound to a port known to be blockaded. If, before the commencement of the risk, the port is known to be blockaded, and the assurer does not insure against condemnation for contraband trade, the policy is good as to all the risks insured against; but the assurer is not responsible for any loss arising from such condemnation. So, if the port is not known to be blockaded until the ship is on her passage, the assurer is not answerable for such condemnation, if, after notice, the ship continues her voyage, and is captured. But if the assurer has insured against a condem nation for contraband trade, the policy is good, and he must answer *96 for any loss arising from a condemnation for that cause, whether the trade be contraband because the goods are munitions of war, or because they are destined or bound to a port known to be blockaded. For the law is the same, because the reason is the same. And in the case of contraband trade, the master, on discovering great danger in pursuing his voyage, as by learning that the port is blockaded, may (as in the case of pirates in the way) [ * 117 ] depart from his voyage, seek an * asylum in the nearest safe port, or even, if more convenient, return to his original port, and wait until the blockade be raised, or the blockading fleet be dispersed, and then may continue his voyage, without being chargeable with deviation. But if the master, knowing the inevitable danger of capture if he proceed on his voyage, should, notwithstanding, continue it, and expose the vessel to certain seizure, this will be a loss not arising from the perils insured against, but from a criminal breach of the duty he owes to his owners, which is barratry. (7) If, however, on learning his danger, the master abandon the voyage insured, and either return home, or proceed on another voyage, this will be a deviation, by which the assurer is discharged. These positions appear to me to result necessarily from the established principles of maritime law applicable to the contract of insurance.
As the case before us is of much importance, we have endeavored to ascertain the practice in Europe in similar cases, but without much success. Emerigon (c. 8, § 5, vol. i. 210) notices policies on voyages illicit by the laws of the country to which the ship is destined ; and unless the insurance is made with a full knowledge of the trade, the assurer is not holden for a loss arising from the illicit trade. But no distinction is made,- whether the trade become unlawful before or after the commencement of the risk. Valin also notices the right to condemn goods contraband of war, (lib. 3, tit. 9, art. 11;) but we do not find, either in him or in Emerigon, any principles stated, as expressly applying to the insurance by a neutral on goods of this description. But Emerigon (c. 12, § 31, vol. i. 542) particularly considers the cases of an interdiction of commerce with any country or port, by the sovereign of the country to which the ship belongs, whether the interdiction is a consequence of declaring war, or arises from the express will of the prince. If the interdiction happen before the commencement of the voyage, the charter party is void ; but if after the commencement [* 118 ] of the risk, the insurance is *not void, for the assurer shall be entitled to his premium. If the interdiction *97 happen while the ship is on her passage, and she is obliged to return home, she shall be entitled to her outward freight from the shippers, who may recover it, as an average, from the assurers on the cargo; and the assurers on the ship shall be answerable for the wages and provisions of the seamen home, having the benefit of the freight out.
Our law in this respect is different. For the ship cannot demand freight, but on delivering the goods, or by virtue of some express provisions of the charter party. And an insurer on the ship is not answerable for the wages and provisions of the seamen, except when they are a general average.
But the blockade of a port by an enemy’s fleet is not a case within the ordinance providing in cases of interdiction of commerce (Val. lib. 3. tit. 1. art. 8.) This is considered as a temporary interruption, and the master may wait until the port be opened, without prejudice to the policy.
In the English books, the right to insure illicit trade seems to be well settled ; (8) but there is no adjudged case determining whether insurance by a neutral of goods contraband of war is, or is not, prohibited.
There are three insurance causes, where the ships were prevented from entering their destined ports.
The first is the case of Hadkinson vs. Robinson. (9) The action was on a policy upon a cargo of pilchards, on board the ship Pascaro, at and from Mount Bay, to Naples; and the policy contained the usual memorandum, including fish. In the outward passage, the port of Naples was, by the government of the country, shut against ah English vessels, on pain of confiscation. The master, having information of this fact, put into Port Mahon for further intelligence. There the report being confirmed, he sold the fish at a low price; and on information received by the owners, they offered to abandon, on the ground *that the [*119] voyage was wholly lost. But it was adjudged that, although the loss of the voyage insured is good cause of abandonment, if it arise from the perils insured against, yet in that case the voyage was not lost by one of those perils, because the detention of the cargo at a neutral port, in consequence of the danger of entering the destined port, was not a peril insured against.
It has been argued, that this decision was founded on the memorandum relating to the perishable nature of the cargo. But we cannot be of that opinion ; for a cargo of fish may as well be aban *98 doned by a loss of the voyage, as a cargo of any other description of merchandise.
The second case is that of Lubbock vs. Rowcroft. (10) The insurance was on twenty bags of pepper on board the ship Nelly, at and from London to Messina. The ship having arrived at Minorca, it was found that Messina was in the hands of, or blockaded by, the French ; in consequence of which the plaintiff offered to abandon to the defendant, and demanded a total loss. But Lord Ellen borough was of opinion that the abandonment was from an appre hension of capture by the enemy, and not from any loss within the policy.
The last is the case of Barker vs. Blakes. (11) In this case, it was determined that when a neutral ship bound from America to Havre, was taken and carried into England., and was there detained until Havre was declared to be in a state of blockade, by which the further prosecution of the voyage was prohibited, such detention, so prolonged, was a total loss within the policy.
From the two first of these cases, it appears that, when the port of destination, after the commencement of the voyage, became hostile, a fear to enter it, because of the danger of capture, is not a loss of the voyage, within any peril insured against. And in the third case, the declaring of Havre to be blockaded is not considered as a loss of the voyage insured, because of the danger of attempting to enter it; but a detention, continued until the [*120] blockade * was considered as a loss of the voyage, which authorized an abandonment, the detention being a peril insured against.
There remains for consideration one other point, arising out of the defence. It is made a question, whether a well-grounded fear that a total loss will arise from one of the perils insured against, if the voyage be pursued, is itself a peril within the policy, which will autnorize the assured to abandon as for a total loss. The question is stated on the supposition that the peril, from which the loss is feared, is insured against by the policy. And on the best consideration we can give this question, we are satisfied that this fear of loss, thus stated, is not a peril within the policy. It is not within the terms of the policy, on any reasonable construction that can be given to them. To admit it to be a peril insured against would be productive of much uncertainty, would open a door to frauds on the assurer, and would be repugnant to the principles recognized in the cases of Hadkinson vs. Robinson, and of Lubbock vs. Raw croft.
*99 We will now consider how far the several positions we have endeavored to establish are applicable to the present case. When the ship sailed for Malaga, that port had been declared to be in a state of blockade; but as the parties had then no knowledge ot this fact, we consider that port as to them open. On the vojage, the master received correct information of the blockade. From that time, if he afterwards continued his voyage to the blockaded port, the cargo insured became contraband of war, which exposed him, on that account, to capture and condemnation. A loss by capture and condemnation for that cause was not insured against; although it was competent for the assurers to have taken that risk on themselves. But the policy was not discharged. And if the master had continued his voyage, the assurers would have remained answerable for such risks as they had insured against, but for no others.
*If the defendants had insured against capture for [*121 ] having on board goods contraband of war, and the master had proceeded on his voyage, and had been captured for that cause, they would have been liable. Or the master, to avoid manifest danger of capture, might, in this case, have gone to some safe port, or even have returned, if more convenient, to his original port, to wait until the danger was removed, and he might afterwards have pursued his voyage without prejudice to his insurance. But if, instead of avoiding the danger that was manifest, the master had voluntarily thrown himself in the way of the blockading fleet, and had been thereby captured, the loss would have been by his barratry.
In the case before us, the master, through fear of capture, discontinued his voyage, and returned home. But the fear of a capture, when the capture is insured against, cannot amount to a total loss, for which the owner may lawfully abandon ; and o fortiori of such a capture as is not insured against.
The conclusion is, that although a just fear of capture occasioned the loss of the voyage insured, yet that loss did not arise from any of the perils insured against by the defendants, and the plaintiffs cannot recover a total loss.
When the master discontinued his voyage, by which is understood an abandonment of it, with an intention in him no further to pursue it, and sailed for his original port, — from that time the policy was discharged. For all sea-damage happening before, the plaintiffs can recover, if it exceed seven per cent. The losses happening after the voyage insured was discontinued, and on the voyage home, are not to be borne by the defendants, because such losses did not happen in the voyage they had insured. Although losses insured *100 against, which happen after a departure from the usual course of the voyage described in the policy for good cause, may be a charge upon the assurer, yet when that voyage is once determined, we can substitute no new voyage in the place of it, and hold [ * 122 ] the assurer answerable for * any loss that may happen in the course of it. For this reason, it is not thought necessary to remark on the subsequent capture, rescue, and embargo, which are stated in the case.
Pursuant to the agreement of the parties, the verdict must be set aside, and a new trial granted. And if the jury, on the new trial, shall assess the sea-damage, happening before the discontinuance of the voyage, at more than seven per cent., then a verdict is to be found for such damages; otherwise a verdict is to be taken for the defendants. (11)

 [Skidmore vs. Desdorty, 2 Johns. Cases, 77. — Ed.]

 Earle & Al. vs. Rowcroft, 8 East, 126. — [See Schmidt vs Un. Ins. Co. 1 Johns 260 -263. —Ed.]

103-13"> 1 Marsh. 54. — Doug. 238, Planche vs. Fletcher.

 3 Bos. & Pul. 388.

 5 Esp. Rep. 50.

 9 East, 283.

 [Smith vs. Un. Ins. Co., 6 Whea. 176. — Lee vs. Gray, 7 Mass. 9. — Tucker vs. N. M. Ins. Co., 12 Mass. 288. — Brewer vs. N. M. Ins. Co., 12 Mass. 170. — Shopley vs. Tappan, 9 Mass. 27, and note. But see 1 Phillips's Ins. 671 — 674. — Salters vs. The U. Ins. Co., 15 Johns. 526. — Savage vs. Pleasants, 5 Binn. 403. — Thomson vs. Read, 12 Ser. Rawl. 440. — Craig vs. U. Ins. Co., 6 Johns. 226. — Corp. vs. U. Ins. Co., 8 Johns. 227. — Simonds vs. U. Ins. Co., 4 Dall. 417. — King vs. Delaware Ins Co., 9. Wash. 300. — Olevira vs. Un. Ins. Co., 3 Whea. 183. — Ed.]