1813.

SAVAGE and another *against* PLEASANTS.

*Philadelphia,*
*Monday,*
*March 29.*

THIS was an action upon a policy of insurance, under-
written by the defendant, as President of the *United*
*States Insurance Company*, on the 4th of *September* 1807,
upon goods by the ship *Union*, *Jacobs*, at and from *Philadel-*
*phia* to *Antwerp*, 15000 dollars at 10 per cent. The policy
contained an agreement by the assured not to abandon in
less than sixty days after advice of capture or detention,
and the usual clause in relation to illicit or prohibited trade.

*An insurance*
*was effected on*
*goods at and from*
*Philadelphia to*
*Antwerp, with*
*an agreement by*
*the assured not*
*to abandon in*
*case of capture*
*or detention in*
*less than sixty*
*days after notice*
*thereof, and*
*with the usual*
*clause against*
*illicit or prohi-*
*bited trade. The*
*ship sailed on*
*the 13th of Sep-*
*tember 1807,*
*was captured by*
*a British pri-*
*vateer on the*
*16th of October,*
*and carried into*
*Plymouth. This*
*event was known*
*to the assured on*
*the 1st of Decem-*
*ber. On the 20th*
*of October the*
*ship's papers*
*were returned,*

·The cause was tried before the Chief Justice at a *Nisi*
*Prius* in *November* last, when it was agreed that a verdict
should be entered for the plaintiffs for 6862 dollars 94 cents,
the full amount of their claim, calculated upon the principles
of a total loss, subject to the opinion of the Court upon the
whole case. If the Court should be of opinion that the plain-
tiffs were not intitled to recover, then the verdict to be set
aside, and judgment to be entered for the defendant. If they
should be of opinion that the plaintiffs were intitled to re-
cover, then they were to say whether as for a partial or total
loss, and if for the former, upon what principles it was to
be calculated.

and she proceeeded on her voyage. On the 27th she dropt anchor in *Flushing* roads, when,
the captain having reported himself to have been in *England*, a guard was put on board
his vessel, and remained there until he was ordered to quit the roads, having been re-
fused permission to proceed to *Antwerp*. On the 16th of *November* or *December*, he sailed
from *Flushing* for *Rotterdam*, intending to discharge his cargo there, and on the 17th of
*December* was captured by a *British* vessel of war, and carried into the *Downs*. These
*events were known to the assured in the beginning of February*. On the 24th of *December* the
ship's papers were returned, with permission to proceed to *Rotterdam*. But various acci-
dents detained her until the captain, hearing of the *Dutch* decrees, determined to pro-
ceed to *London*, and discharge his cargo, which he did in the latter end of *February* or
beginning of *March*. On the 20th of *May* 1808, the assured abandoned on the ground
that the voyage was broken up, and the cargo was discharged in *England.*

*Held* 1. That the prohibition to trade at *Antwerp*, and the arrest at *Flushing*, being con-
sequences of the first capture, they were not within the clause against prohibited trade,
and gave the assured a right to abandon, if exercised in due time. 2. That the dropping
anchor in the roads of *Flushing* was not a deviation, that fortress commanding the *Scheldt*,
and compelling vessels to report there. 3. That sailing to *Rotterdam* for the purpose of dis-
charging, was sailing on a new voyage, which the policy did not protect, and therefore
the underwriters were not answerable for any subsequent disasters. 4. That the arrest and
detention at *Flushing* and turning away, being known to the assured in *February*, the aban-
donment in *May* was too late; and therefore the assured were intitled to recover only for
the loss arising from the first capture, and carrying into *England.*

The facts reported by the Chief Justice were these: The *Union* sailed upon the voyage insured, with the goods of the plaintiffs on board, on the 13th of *September* 1807; and on the 16th of *October* was captured in the *British* channel by the private armed ship *Resolution*, and carried into *Plymouth*. On the 20th the ship and cargo were restored without costs, the papers returned, and the vessel permitted to prosecute her voyage, no one of the officers or crew having been on shore during the detention. On the 20th she arrived in *Flushing* roads, and there cast anchor. As soon as the master reported himself from *England*, a guard was put on board, and continued until she finally departed. Efforts were made by the consignee at *Antwerp* to procure permission for the ship to come there, but they proved abortive; and on the 16th of *November* or *December*, it did not distinctly appear which from the protests, being ordered to leave the roads, she set sail *upon a destination to Rotterdam for a market*, in consequence of recommendations by the consignee. While in the prosecution of this voyage, she was on the day after her departure from *Flushing*, captured by the *British* brig of war *Royalist*, and carried into the *Downs*. On the 24th of *December* her papers were returned, with permission to proceed to *Rotterdam* on payment of the captor's expenses, which the captain agreed to, to prevent further delay. On the 29th of *December*, while the captain was in *London* for the purpose of obtaining advice and assistance, a gale of wind arose, in which the ship was obliged to cut her cable and proceed to *Margate* roads, where she obtained another, and came to anchor, with assistance from the shore. The salvage was adjusted here at 80*l.* On the 10th of *January* she proceeded to *Westgate* bay, where another gale arose on the 14th, and continued to the 16th, in which she suffered some damage in her hull, and was in danger of shipwreck; but by aid from the shore was again saved, at an expense, for salvage, of 886*l.* She then went to *Ramsgate* for repairs, where on the 12th of *February*, she was considerably injured in her channels and mainwhales, by the ship *Paragon's* running foul of her. During this period, the captain remained in *London*, endeavouring to obtain the necessary advances for salvage and repairs, and for the amount of his freight, without

which he would not proceed; and hearing in the month of February of a decree of *Holland*, forbidding the entry of all vessels that had been in *England*, except in case of distress, he determined to bring the ship to *London*, and deposit the cargo with *Bainbridges* and *Brown*, who agreed on that condition to make the advances he required. On the 23d of *February* she accordingly came to *London*, the cargo was landed, and the repairs, salvage, and freight paid.

The intelligence of the *first* capture reached the plaintiffs on or before the 1st of *December* 1807. On that day they wrote to their agents Messrs. *Baring* and brothers, of *London*, requesting their assistance, if the vessel and cargo were not restored, expressing their conviction that the capture would prevent her admission into *Antwerp*, and their hopes, that if that was the case, she might make some other port on the continent.

In the beginning of *February* they knew of the events at *Flushing* and the second capture; and on the 29th of that month they wrote to the same gentlemen in *London*, expressing their regret at her detention in *England*, and saying "if the cargo is *discharged* in *England*, we consider the property as belonging to the underwriters." Messrs. *Baring* and brothers, on the 29th of *March*, wrote to the plaintiffs, informing them that the cargo was discharged, and that when the expenses were settled, they would take their part of it. Shortly after the receipt of this letter, the plaintiffs on the 20th of *May*, abandoned to the underwriters, stating for cause, that " the voyage was broken up, and the cargo dis- " charged in *England*."

No proofs of loss were exhibited to the defendant, until the 18th of *January* 1810; prior to which time, but after the abandonment, namely on the 8th of *December* 1808, the plaintiffs without consulting the defendant, wrote to Messrs. *Barings* to sell their adventure by the *Union*, when an opportunity should offer, stating that they were short insured 14000 dollars, that they were desirous of making the most for all concerned, and that they had no doubt of recovering from the underwriters. On the 31st of *December* 1808, and the 11th of *October* 1809, the adventure, consisting of sugars and indigo, was sold, at a considerable loss. The verdict was made up by taking the proportion which

1813.

SAVAGE

*v.*

PLEASANTS.

the sales, deducting general average and freight, bore to the invoice price, and applying that to the sum insured.

The case was argued at last *December* Term.

*Binney* and *Rawle* for the defendant. The case presents an adventure of goods, which at the time of abandonment were free from any restraint insured against, and in no degree damaged. But they were at *London* and not at *Antwerp.* It is the case of a loss of voyage merely, which gives no right of abandonment, unless exercised in a reasonable and short time after notice. *Anderson* v. *Royal Exchange* (*a*), *Mitchell* v. *Edie* (*b*), *Allwood* v. *Henkell* (*c*), *Duncan* v. *Koch* (*d*). The result of all the disasters which befel the adventure being this, if the plaintiffs can recover a total loss, it must be, because there has been at some period a peril justifying an abandonment, and an abandonment duly made. This has not been the case.

1. The first capture cannot be relied on. *Per se*, it was a cause of abandonment only while it lasted, and it ceased before it was known to the assured. Its *effects*, were such as the policy does not cover, or if it does, recourse to the policy was waived by delay. The only effect was the prohibition to trade at *Antwerp* by the *Berlin* decree. This did not justify abandonment, because it was not a peril acting directly upon the thing insured, but it was the fear and apprehension of a peril. *Hadkinson* v. *Robinson* (*e*), *Parkin* v. *Tunno* (*f*), *Foster* v. *Christie* (*g*), *Brown* v. *Vigne* (*h*), *Richardson* v. *Maine Ins. Co*, (*i*). It was also within the clause against prohibited trade; and as the underwriters are not answerable for this at all, it is immaterial to them from what cause it arises. *Mumford* v. *Phœnix Ins. Co.* (*k*), *Speyer* v. *N. York Ins. Co.* (*l*), *Tucker* v. *Juhel* (*m*), 1 *Marsh.* 346. But be this as it may, the peril of capture and all its effects were known to the assured on the first of *December;* the sixty days expired on the first of *February*, and they did not abandon until the 20th of *May*, which was out of time.

| | | |
|---|---|---|
| (*a*) 7 *East* 42. | (*e*) 3 *Bos.* & *Pul.* 388. | (*i*) 6 *Mass.* 102. |
| (*b*) 2 *Marsh.* 590. | (*f*) 11 *East* 21. | (*k*) 7 *Johns.* 449. |
| (*c*) 2 *Marsh.* 593. | (*g*) 11 *East* 205. | (*l*) 3 *Johns.* 88. |
| (*d*) *Wallace* 33. | (*h*) 12 *East* 288. | (*m*) 1 *Johns.* 20. |

2. The detention at *Flushing*, and the turning away, will not answer. If *Flushing* is an out port of *Antwerp*, then the vessel arrived, and all that followed was a mere interdiction of trade, which is within the clause in the policy. If *Flushing* is not an out port of *Antwerp*, it was a deviation to cast anchor, for there is no evidence either of a custom, or a particular necessity to stop there. But suppose it otherwise, still the arrest, detention and turning away, are all within the clause against prohibited trade. At all events, they were known in the beginning of *February*, and gave if any an immediate cause of abandonment, which was not exercised until *May*. It is perfectly clear that the assured intended to speculate at the underwriter's expense. If the cargo could reach the continent, they would take the profit; and they intended to abandon, only in the event of its being discharged in *England*. This it was not competent for them to do; but it shews why they did not elect to consider any event up to this time as a total loss.

3. The second capture and its consequences are insufficient. The vessel sailed from *Flushing* for *Rotterdam*, not for advice, nor to wait an opportunity for prosecuting her original voyage, but to obtain a market. This was a clear deviation, which discharged the underwriters; for if the port of destination is shut, the policy does not protect the adventure to another port of discharge. The original voyage was abandoned, and the policy was at an end. *Parkin* v. *Tunno* (a), *Blackenhagen* v. *Royal Exchange Ass. Co.* (b), *Lee* v. *Gray.* (c)

4. The abandonment when made, did not state a sufficient cause. It gave the result, and not the accident or peril, which should have been communicated, that the underwriters might know how far it was their duty to accept. The cargo might be discharged and the voyage broken up by the fault of the captain, as in fact it was from his solicitude to obtain his freight. Stating this, therefore, stated nothing material. *Suydam* v. *Marine Ins. Co.* (d), 2 *Marsh.* 601., *King* v. *Delaware Ins. Co.* (e).

(a) 11 *East* 22.  (d) 1 *Johns.* 191.
(b) 1 *Campb.* 454.  (e) 6 *Cranch* 78.
(c) 7 *Mass. Rep.* 349.

*5.* If duly made, the abandonment was waived by the conduct of the plaintiffs in selling without our assent. Until acceptance an abandonment is revocable. It was therefore in the plaintiffs' power to waive it, and they did by exercising an ownership, incompatible with the abandonment. Had the adventure brought a profit, no doubt they would have retained it. It is true they were part owners, to the extent that they were uninsured; but part owners cannot sell the entire property.

6. There being no total loss, the only question is as to the extent of the partial loss, which we contend is confined to the average at *Plymouth.* The disasters in *England* after the second capture, do not concern us for the reasons before stated. Damage to the goods there was none at any time. Freight paid in *England* which is also claimed, is not chargeable to us; first because it was not due, and secondly because underwriters on goods have nothing to do with the freight. And as to the loss arising upon the sales, that is a loss of market, which, unless it is a cause of abandonment, is nothing.

*Dallas* and *Ingersoll* for the plaintiffs, contended that there was a good cause of abandonment, duly exercised, and persisted in.

By the capture and carrying into *Plymouth,* the *Berlin* decree was brought into operation, and an insurmountable impediment raised to the termination of the voyage at *Antwerp.* Every thing therefore relative to the clause against prohibited trade, is misapplied, because that prohibition was brought into operation, if at all, by a peril insured against. If the trade became illegal, it became so by the capture; and it can never be permitted to underwriters to take advantage of an illegality induced by an accident for which they are liable. At the moment then when the capture, by means of the *Berlin* decree, cut off this vessel from its port of destination, it broke up the voyage, it rendered seizure or turning away from *Antwerp* morally certain, it justified the assured in making an abandonment. It was not fear or apprehension merely; it was not a contingent evil which might or might not happen; the loss of the voyage by this accident was as certain morally speaking, as

if the vessel had never been restored by the captors; and though the voyage was prosecuted to *Flushing*, that it might not afterwards be objected against our claim to an indemnity, that it was the duty of the master to proceed, yet that further prosecution was as hopeless in the beginning as it proved fruitless in the end. Under such circumstances the owner cannot be required to go on. The legal impediment, is as effectual a restraint as actual force. The interest of the underwriter forbids his encountering the consequences of an attempt to surmount it; and his own duty to the power that created it, commands an acquiescence. In such cases the policy is blank paper, if the assured may not abandon; and contrary to the cases cited, there are decisions both in *England* and the *United States* which justify an abandonment. *Barker* v. *Blakes* (a), *Craig* v. *United Insurance Company* (b), *Snowden* v. *Phœnix Ins. Co.* (c), *Hurtin* v. *The Phœnix Ins. Co.* (d), *Symonds* v. *The Union Insurance Company* (e).

Under these facts there was a perfect right to abandon. But at the same time there was a right to suspend the exercise of it, until inquiry had been made at or near to the port of destination. At *Flushing* where the ship cast anchor, she was guilty of no deviation, because that fortress commands the *Scheldt*, and all vessels bound to *Antwerp* are forced to pass under its guns. The master reported himself to the commandant, which implies a necessity for casting anchor, and his vessel was immediately put under actual arrest. Here was actual physical force, preventing the further prosecution of the voyage, and finally compelling the vessel, after ineffectual efforts of the consignee to depart. Was it necessary still to proceed to *Antwerp?* This if not impossible, would have been instantly fatal. To what port was she then to go? The captain was intitled to act for the benefit of all concerned, and to proceed to the most advantageous port. To go somewhere for the purpose of discharge was essential; and although the severity of some *English* decisions has denied the right, yet it has not been in cases

(a) 9 *East* 283.
(b) 6 *Johns.* 226.
(c) 3 *Binn.* 457.
(d) 2 *Marsh.* 601, a.
(e) 4 *Dall.* 417.

**1813.**

SAVAGE
*v.*
PLEASANTS.

like this, where a peril insured against has defeated the original voyage.

At the time of the second capture and detention, then, there was a perfect right to abandon, and sixty days after the intelligence was received in the month of *February*, brings it within a short time of the 20th of *May*. But if this is too late for the causes occurring at *Flushing*, the disasters in *England* gave a new right. By this time the *Milan* and *Dutch* decrees made every port of the continent impracticable, and confiscation was the inevitable consequence of arrival there. The vessel was injured, and no one was found willing to lend upon hypothecation on a voyage to the continent. The circumstances bring the case precisely to *Milles* v. *Fletcher* (a), and justified discharging the cargo. The knowledge of this event, was immediately followed by abandonment.

There has been then a peril, or rather a variety of perils flowing from or connected with each other, justifying abandonment.

It was duly exercised, because to state that a cargo has been discharged and the voyage broken up, implies that a peril insured against has caused it, or it would not be communicated to the underwriters; and if they wanted further information, it was their business to inquire. *Ralston* v. *Union Ins. Co.* (b).

It was persisted in, because the same letter which orders the sale negatives the waiver, by asserting the claim upon the underwriters. As part owners, the plaintiffs had a controul over the property, as to their own share at least; and no injury was done by sale of the whole. It was necessary to sell the whole for expenses due by the whole. Whether a waiver of the abandonment or not, depends on the *quo animo*, which was clearly against the waiver. If however there is not a total loss, there is at least a right to an indemnity, which can only be obtained by paying the general average in *England* upon both captures, and the loss upon the invoice by the sales, which of course includes the freight paid in *London*. Not having received the goods at *Antwerp*, the

(a) *Doug.* 219.          (b) 4 *Binn.* 399.

plaintiffs derived no advantage from the payment of freight; and the payment of it was therefore a loss *pro tanto.*

*Cur adv. vult.*

On this day the Judges delivered their opinions.

TILGHMAN C. J. On this case two questions are submitted to the Court:

1. Whether the plaintiffs are intitled to recover for a *total* loss.

2. Whether if not for a *total,* they may not recover for a *partial* loss, and on what principles such loss is to be estimated.

There is no doubt but the voyage has been broken up by events beyond the plaintiffs' controul. But the defendants contend that they are not responsible, because it was not broken up by any peril which they insured against; not by perils of the sea, capture or restraint or arrest of princes, but solely by decrees of the *French* emperor, which under the circumstances of this case prohibited an entry into the port of *Antwerp.* The defendants rely on the principles established by the late *English* decisions, cited in the argument, viz. 3 *Bos.* and *Pull.* 388, *Hadkinson* v. *Robinson;* 11 *East* 21, *Parkin* v. *Tunno;* 11 *East* 205, *Foster* v. *Christie;* 12 *East* 288, *Brown et al.* v. *Vigne,* which appear to have been adopted by the Supreme Court of *Massachusetts,* in *Richardson* v. *The Maine Fire and Insurance Company,* 6 *Mass. Rep.* 102.; *Amory and Co.* v. *Jones,* 6 *Mass. Rep.* 318, and *Lee* v. *Gray,* 7 *Mass. Rep.* 349. On these principles the insured is not at liberty to abandon, where the ship has reached the port of destination, and is refused an entry by the government of the place, or where the voyage is relinquished in consequence of intelligence that the port is blockaded or in the hands of an enemy, or that a hostile embargo has been laid. The decisions alluded to are bottomed on this reason, that the loss is not occasioned by a peril insured against, because a *fear* of capture or detention is very different from the *fact* of capture or detention. To permit the assured to abandon in every instance where capture is apprehended, would place the assurer upon a very uncertain and unjust footing, because there might be an

1813.

SAVAGE
v.
PLEASANTS.

*affected* or even a *real* fear, where there was very little actual danger, and it is truly said that the risque of capture is one of the immediate objects of the insurance, and therefore the assurer has a right to insist on the chance of escape, of which he is deprived by the relinquishment of the voyage. On the other hand the assured may be placed in a very hard situation as the law has been held. If he attempts to enter a blockaded port after notice, he forfeits the right of a neutral; if he attempts to trade in a port into which an entry has been prohibited, even after the commencement of the voyage, his property is liable to confiscation; and if being refused an entry, he steers for a different port, the underwriters are discharged, because it is not the same voyage which was insured. Thus without any default of the assured, his property is left uncovered. From the opinion delivered by Chief Justice *Kent* in *Craig* v. *The United Ins. Co.* 6 *Johns.* 226, it appears that the Supreme Court of *New York* have doubts whether the law has not been carried too far in favour of the insurers, in the cases which I have mentioned. It is unnecessary to express an opinion on that subject, as the case before us is distinguishable from all those which have been cited in favour of the defendants. It has never been decided that the assured may not abandon and claim for a total loss, where a voyage is broken up by a peril insured against. On the contrary, in *Barker* v. *Blakes,* 9 *East* 283, on an insurance from *New York* to *Havre de Grace,* where the ship was captured and carried into *England,* and during her detention there, the port of *Havre* was declared by the *British* government to be in a state of blockade, it was held that the assured had a right to abandon, the voyage being broken up in consequence of the capture and detention. Now in the present instance, the capture and carrying into *England* were the causes that the ship would not have been permitted to enter the port of *Antwerp.* For the decree of *Berlin* would have been no impediment to an entry, if there had been neither capture nor going to *England.* But it is said, that although this carrying into *England* might have been cause of abandonment, yet it was waived by the resumption of the voyage. Supposing this answer to be sufficient, yet another peril within the policy, soon afterwards occurred at *Flushing.* As soon as the ship came to an anchor and the master re-

ported that he came last from *England*, a guard was put
on board of her, and continued till she left the port. So
that the voyage was stopped by the actual force of the govern-
ing power at *Flushing*. But it is contended for the defendants,
that dropping anchor at *Flushing* was a deviation. I cannot
think so; it was necessary to come to an anchor, and make
report, because the fort at *Flushing* commands the passage
of the *Scheldt*. Again it is said by the defendants, that if the
entry into *Antwerp* was unlawful, they are not responsible
for it, because the plaintiffs have agreed not to look to them
for any loss by seizure for illicit trade. But the trade was
no otherwise unlawful than in consequence of an accident,
against which the defendants had insured, viz. the capture
and carrying into *England*. They must not be permitted
therefore to avail themselves of an illegality springing from
this source. The voyage then having been stopt by actual
force of the government at *Flushing*, the plaintiffs might
have abandoned to the defendants and claimed for a total loss.
But did they exercise that right in due time? The breaking
up of a voyage where the goods remain safe, is not a loss
total in its nature. It is in the option of the assured to con-
sider it so or not as he pleases. But he must decide in a rea-
sonable time, and make known his determination to the in-
surers, otherwise they will be liable for no more than the
actual loss. In this case, the plaintiffs had notice of what
had happened at *Flushing*, probably about the middle, but
certainly before the last of *February*. Now allowing what
they contend for, that they had no right to abandon in less
than sixty days from the time of notice, still I am of opinion
that their abandonment was too long delayed, especially
when the motive of the delay is considered. They did not
abandon sooner, because they had it in view to proceed to
*Rotterdam;* and it was not until this scheme was frustrated
by the unlading of the cargo in *England*, that an abandon-
ment was finally resolved on. They have no right after all
this to throw the cargo on the defendants. But they have
sustained damage, and shall they not be indemnified?

This brings us to the second point of inquiry.

There is no doubt but that the defendants are liable for
an average loss on the first capture and detention in *England;*
that is not disputed. The objects of dispute are, 1st, an ave-

1813.

SAVAGE
*v.*
PLEASANTS.

rage loss in consequence of the second capture, and of storms and accidents on the coast of *England* after leaving *Flushing*. 2d, The loss arising from the difference between the invoice value of the goods, and the proceeds of the sales in *England*. 3d, Freight.

The insurers are not liable for any partial loss not happening in the course of the voyage insured. When the ship was stopped at *Flushing* and afterwards released, if she had proceeded to one of the neighbouring ports with a view of prosecuting her original voyage as soon as the danger should be over, she would have been covered by the policy. But it appears she sailed from *Flushing* with a view of proceeding to *Rotterdam* for a market. This was not the voyage insured, and therefore the insurers are not answerable for losses sustained in the course of it. They are not answerable then for the losses by the second capture, and the storms and accidents on the coast of *England*, nor for the difference between the first cost of the goods and the sales in *England*. Indeed I see no principle upon which that *difference* could be reckoned as a partial loss, as the goods themselves received no damage. As to freight, it was not earned, and therefore the insurers are not chargeable with any loss on that account.

Upon the whole, I am of opinion that the plaintiffs are not intitled to recover for a total loss, but that they are intitled to recover for a partial loss which arose on the first capture and detention in *England*, and for no more.

YEATES J. It seems an insuperable bar to the recovery of the plaintiffs for a total loss in the present instance, that the state of the fact did not justify the abandonment at the time it was made. The sugars and indigo insured, appear by the protest of captain *Jacobs* on the 28th of *April* 1808, to have been safely landed in *London*, and deposited with the rest of the cargo in the hands of *Bainbridges* and *Brown*, as a security for money advanced by them for the necessary repairs of the ship *Union*. They were not then under the restraint or detention of any foreign prince. Besides, the loss of the voyage was no total loss in itself, but a cause of abandonment only, according to the doctrine laid down in *Anderson* v. *Royal Exchange Assurance Company*, 7 *East*

42. The capture of the ship and sending her into *Plymouth* on the 19th of *October* 1807, and the subsequent capture and sending her to the *Downs* on the 17th of *November* following, were at most but the grounds of a technical total loss. Of the first capture the plaintiffs had information previous to their letter to Messrs. *Baring* and Co. of the 1st of *December* 1807; and by another letter addressed to the same gentlemen on the 29th of *February* 1808, it appears that they knew of her second capture and of her having been at *Ramsgate* on the 22d of *December* preceding. The plaintiffs should have made their cession in a reasonable time after knowledge of these captures; and a delay of nearly two and a half months must be considered as fatal to their claim for a total loss. The books are filled with cases upon this point. Among others, the case of *Anderson* v. *Royal Exchange Assurance Company* before cited, *Barker* v. *Blakes*, 9 *East* 294, and *Livermore* v. *Newburyport Insurance Company*, 1 *Mass. Rep.* 264, may be referred to. Moreover if the abandonment was valid to charge the defendants as for a total loss, it was utterly inconsistent therewith, that the plaintiffs should assume a power over the goods insured, by directing their correspondents in *London* to sell them, subsequently to the cession of their interest therein to the underwriters; when in fact they could only exercise a dominion over such proportion of the goods as were short insured.

The important inquiry will then be, whether under all the occurrences which have happened, the defendants are responsible for a partial loss, and to what extent?

It cannot be denied that when the *Union* was pursuing her voyage to *Rotterdam*, she departed from the track of her voyage to *Antwerp*. How far she had proceeded, we are not informed by the captain; but this we know, that the two ports lie in opposite directions.

It has been strenuously contended, that the *British* capture justified the deviation upon the ground of necessity, and that the loss of the voyage insured necessarily flowed therefrom, which was one of the risks contained in the policy. These observations merit our serious consideration.

I take it to be fully established that the master of a ship insured, finding that some change has been effected in the

commercial relations of his port of destination, may proceed to a neighbouring port to obtain information; that he may if he thinks it prudent, continue there until the impediment obstructing his voyage is removed, and that while he lies by for these fair and honest purposes, the property insured is protected by the policy. But if after notice of a blockade, the captain continues his voyage to the blockaded port, the cargo insured becomes contraband of war, and a loss by capture and condemnation on that account is not insured against, although it is competent to the insurers to take that risk on themselves. 6 *Mass. Rep.* 120. Thus in *Blackenhagen* v. *London Assurance Company*, 1 *Camp.* 455, if the captain of a ship learns in the course of his voyage to a foreign port, that an embargo is there laid on all the ships of his nation, it was held that he might wait at some place as near thereto as he safely could, until the embargo should be removed; and the goods insured would be protected by the policy, while the voyage remained legal. But if she sailed back for her port of outfit, and was lost, the voyage insured would be considered as abandoned, and the assurers be discharged. When the master discontinues his voyage, (by which is understood an abandonment of it, with an intention in him no further to pursue it) and sails for his original port, from that time the policy is discharged. 6 *Mass. Rep.* 121. So in *Lee et al.* v. *Gray*, 7 *Mass. Rep.* 352, where a captain heard on his voyage of the *British* orders in council of the 11th of *November* 1807, and that he could not proceed to his destined port in *Holland*, it was resolved that he might depart from the course of his voyage, and proceed to *Plymouth* to procure intelligence and advice, and not with the intention of discontinuing the voyage; and such proceeding would be no deviation. But should he sail from *Plymouth* to *London*, the original voyage would be abandoned, and the insurers be no longer liable. Though the loss of the voyage insured is good cause of abandonment, if it arise from any of the perils insured against, yet the detention of a cargo at a neutral port, in consequence of the danger of entering the destined port, is not such a peril. *Hadkinson* v. *Robinson*, 3 *Boss.* and *Pull.* 388, *Richardson et al.* v. *Maine Insurance Co.* 6 *Mass. Rep.* 119. The restraint of princes which will excuse the master of a vessel for not delivering his cargo at the port of destination, means an *actual* and *operative* re-

straint, and not a merely expected one. *Atkinson* v. *Ritchie*, 10 *East* 530. The risk insured against must be the *direct*, and *immediate* cause of the loss. 3 *Bos.* and *Pull.* 392, before cited. In illustration of this doctrine, Lord *Ellenborough* in *Forster* v. *Christie*, 11 *East* 209, puts this case; " suppose " there had been fair weather to a certain point of the voy- " age, and then bad weather and adverse winds, which had " prevented the vessel from entering her port of destination, " till she had received advice of the embargo, which obliged " her to put back, could that have been declared on as a loss " by the perils of the sea? And yet that might as well be said " to be the *causa remota* of the loss of the voyage, as a de- " tention by a king's ship in the particular case. But that " will not do; the risk insured against must be the *effective* " cause of the loss, in order to charge the underwriters.

I readily admit that these decisions operate with severity on the insured, and seem in some degree to counteract the principle of indemnity, which is the sound basis of all in- surances; because a loss has in fact arisen from the capture under the *British* order in council of the 11th of *November* 1807, issued after the commencement of the voyage, which could not be foreseen nor guarded against by human pru- dence. Without any fault or negligence on the part of the insured, or their agents, the ship was prevented from reach- ing her port of destination, and left wholly without protec- tion, although an adequate premium had been paid for the ordinary risks of the voyage. But it is of the utmost moment to the interests of commerce, that the determinations of the tribunals of justice in similar cases should be adhered to; and it will be recollected that the losses here did not occur in the course of the voyage insured, and that the assured had given an express warranty against seizure for prohibited or illicit trade. After an actual deviation, the underwriters are no longer liable. My opinion therefore is, that the de- fendants are not responsible for any losses which accrued after the 16th of *November* 1807, the time at which the ship left the roads of *Flushing;* though they are liable for those which previously accrued.

BRACKENRIDGE J. Notwithstanding the minute report of the Chief Justice in this case, and the lucid exposition

1813.

SAVAGE
v.
PLEASANTS.

of facts by the counsel on both sides, yet it is not so easy a thing to catch by the ear. as to see by the eye.

*Segnius irritant animos demissa per aures,*
*Quam quæ sunt oculis subjecta fidelibus.*

It is for this reason that no report of a judge, or exposition by the counsel, of the facts in the case, can be equal to a special verdict or a case stated. For though the ear hears, yet the hand occupi··d in noting what always too rapidly occurs, the attention is divided between the hearing and the writing, the combining clerkship with the thinking faculty. I make this apology, because under this disadvantage I am not perfectly sure that with all the pains in my power, I have all the material facts of the case perfectly in mv mind; and where this is not the case, the application of the law to the facts must be incorrect.

As I understand the case,—in the *English* channel off *Plymouth*, the vessel and cargo in question were captured; for I call it a capture, where, by compulsion she was forced from the direct course of her voyage. What would have been a *deviation*, when compelled to make, must amount to a capture. *Eo instanti* the insured would have had a right to abandon, had it not been for a clause in the policy precluding an abandonment until sixty days after the perils insured against, had attached. This in the case of capture. The lapse of sixty days must have been provided, with a view to give the chance of recapture or liberation, as the state of the fact under the late decisions might avoid the abandonment; it being understood to be the law now, that the state of the fact, not the date of the intelligence, fixes the right of abandonment. But before it was physically possible to give intelligence of the fact of capture, by a communication to the assured himself, the vessel and cargo were released. She was at liberty to prosecute her voyage. But in the mean time, she had been not only taken out of the direct course, but she had been carried into *British* anchorage, the contaminating touch of which, in the contemplation of the government within whose jurisdiction the port of destination was, disqualified her from an entry at that place. Being now at liberty to prosecute her voyage to the port of destination, the right of abandonment which before had an inception,

may be considered as suspended; but suspended only because though it was possible, nay probable that an entry would be prohibited at the port of destination, yet it was not certain. The being compelled to cast anchor in a *foul port*, was compulsory; and this shewn at the port of destination, might form an exception to the prohibition of an entry. It behoved therefore to go to the port of entry, in order to represent the fact of the duress, and await the pleasure of the government. This experiment was made, and an entry was prohibited. The right of abandonment then attached, unless within an exception in the policy. This is seizure or detention, " for or on account of any illicit or prohibited trade." But the capture or carrying into a *British* port, was the cause that an entry to the port of destination became prohibited; and the capture and carrying were a peril insured against. The decision of the Court in the case of *Forster* v. *Christie*, 11 *East* 205, does not appear to have the substratum of good sense, and is carried beyond that of *Hadkinson* v. *Robinson*, 3 *Bos.* and *Pull.* 338. In this last case it was merely that of the port of destination being embargoed, that was alleged as the cause of the loss of the voyage. In the former there was a restraint and detention of a prince. The vessel was boarded by the crew of a boat, with orders to put them under the protection of the king's ships, and the boat's crew remained on board to enforce obedience to the orders. It was this restraint and delay that occasioned her not arriving until after an embargo had been laid in her port of destination. I find myself supported in not implicitly submitting to the ideas of Lord *Ellenborourgh* in that case, by the language of Chief Justice *Kent*, 6 *Johns.* 253. " I am aware," says he, " that some late cases go a great way towards denying " this right to the assured. But in this case I cannot at " present concur, and when the case arises, I shall chuse to " give it further consideration." But we have the case 8 *Johns.* 217, that notwithstanding the endorsement of papers, it might not be certain that the *French* and *Spanish* decrees would be enforced, as the vessel had not submitted to the making such endorsement. It was compulsory; she ought to have proceeded until the decrees had been actually brought to bear upon her. There was not a moral certainty of being seized on her way to the port of destination, or at

the port. But I am disposed to attribute a greater consequence to the endorsing papers; it alters the character of the vessel, and makes it *sub modo* a different property. The *British* themselves speak of such marking or endorsing on sea letter and register, as giving them a qualified property in the vessel and cargo, and they act upon it accordingly, and seize and capture outright, if an attempt is made to go to another than a *British* port as ordered to proceed. The hailing and warning a vessel at sea are not the same with entering on board and endorsing papers. There is a great difference in the case. The sound of the warning carries no impression with it, it is a monition to the warned; but who shall know that a vessel has been warned? But the writing on the sea letter and register carries with it its own evidence, and will be seen by those who visit afterwards. It is a brand upon the flank or rather back, *endorsed,* if I may play upon a word. It is a charm or spell from which the vessel cannot escape; she is liable to be taken, and is uniformly taken, if she attempts to proceed or to return. She must obey the directions and proceed to a *British* port. Why is it that large premiums in case of neutral insurance are given, ten per cent., as in this case? Sea risk? It must be more. Capture of war? Neutrals can run no risk of this; as to them there is no war. It must be *restraint* and detention of princes, questioning the neutral character of ship or goods, or such arbitrary regulations as they may chuse to assume. What, but orders in council or *Berlin* and *Milan* decrees, is there to increase the premium in such cases? The violation of a prohibition of trade is excepted in this case; and therefore an entry at ports prohibited cannot be attempted, or at least persisted in. The prohibition must be submitted to, and it is the consequence that is insured against. If not this, there is nothing to insure against as an object of increased premium. It is not an insurance that a vessel shall be received in a prohibited port, but an insurance against what is a cause of not being received. The *British* marking is the real cause; and it is admitted by both Chief Justices *Kent* and *Parsons,* that the lawfulness of *Berlin* and *Milan* decrees or orders in council must be laid out of the case. It is the effect, the fact of the restraint, that can alone be taken into view. I would add my eulogy to that

of the counsel in the argument, upon the distinguished legal talents of Chief Justice *Parsons*, were it not *lignum in sylvas*, and totally unnecessary. I premise this that I may take the liberty to say with deference, that I do not think his reasoning, 6 *Mass.* 102, is in every particular without fallacy. I agree with him that information at sea to the master of a neutral vessel, and a warning not to proceed, is not of itself a restraint or detention of the vessel; but he omits noticing the most material circumstance, and which distinguishes it from a bare warning not to proceed, and that is the writing on the sea letter and register. This makes all the difference in the world in the case. He considers the vessel after warning, for he still keeps out of view the endorsing papers, as being restored to the condition in which she was before; that is, free to proceed. Was that the case? If so, how came it that after proceeding not as she was ordered to do, to a *British* port, but discontinuing her intended voyage and proceeding on her course to the port from whence she had set out, she was boarded by a *British* letter of marque, captured as a prize, and ordered to *St. Nevis?* Why was she captured, but, as after having had a mark set upon her, she was endeavouring to escape? The Chief Justice thinks that because the warning was not a capture *eo nomine*, it did not amount to a capture. It would seem to me that the neutral country of the vessel had a right to consider it so, and to demand reparation, when the loss of the voyage is occasioned by such an act. Our case was not that of endorsing papers, but within the same reason, the being carried into an *English* port, which, as to a reception in the port of destination, wrought the same effect. And the vessel here did not rest upon the the moral certainty of not being received, but actually made the experiment. There was no *quia timet* in the case, or apprehension of being excluded. She proceeded to the port of destination, and after all representations as to the compulsory circumstance of her being carried into a *British* port, she was excluded. The casting anchor at *Flushing* was no deviation, but in the direct course to *Antwerp*, the place of destination. It was the casting anchor short of *Antwerp*, and waiting there to make the representations and to obtain advice what to do, for the benefit of those concerned. The sailing in consequence of advice to go to

*Rotterdam*, was with a view to do the best for those concerned, and comes under the head of labouring and travelling, as by the clause in the policy the assured was bound to do. I resolve the whole into the first capture and being carried into a contaminated port. All that took place after, was a struggle to escape from the effect of it.

The vessel having sailed for *Rotterdam*, was captured a second time and carried to the *Downs*. It is at this point of the case that I have not the facts so fully in my mind as I could wish. But as I understand it, she was again liberated, and so no right of abandonment existed for the second capture. But in the *Downs* she suffered from a storm, and she could go no where for the benefit of those concerned, without being repaired. At *London*, the nearest port, or port where there might be a prospect of getting the means of repairing, endeavours were used to raise funds for the purpose of repairing. The captain found he could not hypothecate; no agent, no consignee here, he could not otherwise than by a sale of some part of the cargo, raise the money necessary to repair. He did sell, and raised the money and had the vessel repaired. So far all seems fair enough. It seemed to be the best that could be done; but here comes the *rub*, if I understand the matter right. The captain claimed freight. Had he a right to freight? It was not earned. The vessel had not arrived at her port of destination, but returned to the port from whence she was at an intermediate point of her voyage, and freight not due. But the captain sells to pay himself, or insisting on freight, a part of the cargo is sold to pay. The captain was the agent of the assured in all this transaction. At least he must be considered so; and in that case, it is the same thing as if the assured had disposed of a part of the cargo and paid the captain. They had not therefore the cargo to abandon, and it would seem that they must be considered as waiving the idea of abandoning and claiming for a total loss. I am not able to get over this difficulty. Here I must stop, I can pursue the matter no further. If the assured must be considered as paying freight in their own wrong, they must take it on themselves, and it is said to be the matter of freight only that makes the difference as to a total or a partial loss. From this conception of the facts as I have them in my mind, it would seem to me that the assured must look to the captain to recover back

freight which ought not to have been paid, and it does not lie with the assurer to look after him, having the loss thrown upon them in the first instance. My idea therefore would be, that he cannot oblige the assurer to take the place of the assured, and call this a technical total loss.

1813.

SAVAGE
v.
PLEASANTS.

Judgment for a partial loss arising from the first capture, and detention in *England*.