Sewall, C. J.
In this action the demand of the plaintiff is upon a policy of insurance, and they aver a total loss to have happened within the voyage and risk insured. A verdict for them, subject to the opinion of the Court upon a report of the case, having been consented to on the part of the defendant, the merits of the controversy have been fully discussed on a motion for a new trial.
The case reported is according to the evidence offered, and considered at the trial of an action brought by these plaintiffs against William Gray, another underwriter, upon the same policy, for another portion of the same loss. In finding a verdict against W. Gray, the jury were directed by an opinion, which I expressed m committing the cause to them; and the present motion for a.new trial is, in effect, an exception to that opinion.
Two questions are brought into view, and necessarily arise, upon the facts stated in the report; — whether the loss proved is within the policy, or is to be attributed to a risk and misfortune excepted from the policy, and not insured against; and whether, if the defendant is liable at all, a seasonable abandonment has been proved, to entitle the” plaintiffs to recover as for a total loss.
The latter question, however, the counsel for the defendant have been disposed to waive in their argument; and they have insisted only upon their more general objection, that the loss demanded is not within the policy.
The contract averred and proved is an insurance upon the cargo of the ship Diana, at and from Boston to every port and place to which she may proceed, excepting the West Indies, until her arrival at her port of discharge in the United States, the time not exceeding twenty months, against restraints and detainments of princes, &c., with the * other risks usually undertaken [ * 106 ] by insurers. And in a clause added at the foot of the policy are these words: “ The Diana is cleared for Rio Janeiro and the North-West Coast, has goods on board contraband of war, and has no register. This insurance is not against illicit trade with the Spaniards; but is understood to cover the property, under what ever papers she may sail.”
*104 The Diana, with a cargo protected by this insurance, sailed from Boston July 5, 1800, bound to Lima, in the province of Peru, and ultimately, according to the vessel’s papers, to Sansonate, in the province of Guatimala. On the 5th of December, 1800, she arrived off the port of Callao, and in the bay of Callao was boarded by officers of the viceroy of Peru, and prevented from entering the port, until permitted by the viceroy. This permission was presently obtained, and the ship entered the port of Callao, as a vessel in want of water and refreshment, but with a guard placed on board by the viceroy, and subject to other precautions, taken by his orders, to prevent smuggling or trade of any kind. After remaining some time under this restraint, liberty to depart, for the purpose of pursuing the voyage to Guatimala, was requested and refused; and finally, the case having been submitted to the royal tribunal or council of Peru, for their decision or advice, their decree, or the result of their deliberation upon the case, was submitted to the viceroy, and by him confirmed and adopted; and he thereupon directed the cargo of the Diana to be landed and sold, under a particular inspection of the revenue officers, the proceeds to be placed in the treasury, there to remain until the king’s pleasure should be known. And in this way the cargo insured had been disposed of, when the assured offered to abandon to the underwriters.
In several conversations with Mr. Burling, one of the supercargoes of the Diana, at the time when permission to enter the port of Callao was applied for and obtained, and afterwards, her arrival off that port, and destination to a port of a Spanish colony [ * 107 ] in the south seas for ' purposes of trade, * were stated by the viceroy to be causes to justify an arrest and detention. “The vessel and cargo,” he said, “ were thereby subjected to confiscation, and the ship’s company to imprisonment.” The royal tribunal or council appear to have considered the case in the same light, and the property as placed, in consequence, at the disposal of the government. But the viceroy and his council admit their decision to have been controlled, in this instance, by the peculiar circumstances and confidence under which the voyage of the Diana had been commenced, and was intended to be prosecuted.
In this view of the case, some other facts, proved and relied on at the trial, have been stated and considered ; particularly that the king of Spain, by an edict, dated November 8, 1797, authorized the viceroy of Peru, and the other viceroys of the Spanish colonies in the south seas, to grant licenses and permission of trade in neutral vessels, and expeditions and adventures in goods not otherwise permitted; that passports and licenses, by the viceroy of Guatimala, *105 were granted to one Yrizarrere, and to his agent, Ramirez, colonists of Spain, to permit Ramirez to embark at Omoa or Truxillo, and go to neutral ports of the Anglo-Americans, and purchase lawful goods, to be imported into the colonies, with such arrival and destination as should be specified by any Spanish consul residing in the United States; and that, acting under these licenses, certain contracts by Ramirez, dated in January, 1800, were made for Yrizarrere and himself with the present plaintiffs; by which the Diana, her cargo and, voyage, were covered as the property of Yrizarrere, and as under the direction of his agent, Ramirez, who was a supercargo and passenger in the ship, and arrived in her at the port of Callao.
it was also proved that, in January, 1800, the governor of Guatimala renewed the passports and licenses granted by him to Yrizarrere and Ramirez, and declared the same to be in full force; and that, in June, 1800, the Spanish consul residing at Boston granted certificates of the cargo of the * Diana, [ * 108 ] and specified her destination to Callao, in Peru, and Sansonate, in the province of Guatimala.
It also appeared, from documents produced by the defendant, that the king of Spain, by an edict, dated April 20, 1799, had repealed the edict of November, 1797, and had declared all passports and licenses, general and particular, which had been granted, to be null and void.
But it was admitted or proved at the trial, that this edict of repeal, which had been officially communicated tc the viceroy of Peru, before the arrival of the Diana, was unknown to the viceroy of Guatimala, when he granted his passports and licenses; and to the parties concerned in the Diana and her cargo when the voyage insured commenced.
The opinion now objected to, and contested for the defendant in this action, was, that the exception from the policy, or the limitation of the insurance expressed in the additional clause, respected seizures for an actual trading, or some "attempt to trade, with the Spaniards in an unlicensed manner; and that the voyage and destination to the port of a Spanish colony was within the policy; and that the cargo of the Diana was to be considered as insured against the risk of seizure and detention for that cause ; and the jury were directed to find for the plaintiffs, if a seizure and detention had been proved which had been enforced for no other cause than an arrival on the coast or within the port of a Spanish colony. This opinion, expressed with an expectation, stated at the time, that the question of construction would be reserved for further inquiry and *106 consideration, was influenced in some degree by a circumstance which can have no weight in the present decision.
It may be recollected that, in a former action by the present plaintiffs against William Gray, (1) several suits, if not upon this policy, yet upon other policies, to insure the same risk with the same exception, or a limitation in words of the same import, had been brought within the notice of the Court; particularly two [ * 109 ] suits against public insurance * companies, in which, as it was then stated and understood, the plaintiffs had recovered judgments, which had been so far acquiesced in as to have been the foundations of compromises between the parties, and of payments to the assured, obtained from the defendants in those suits, and from several of the underwriters on the policy now in question. This seeming construction of an insurance of the same risk, under the direction of merchants respectable for their professional knowledge and accuracy, was, in my mind, an authority of some weight, sufficient at least to suggest the necessity of a further examination.
The case of Church vs. Hubbard, (2) decided in the Supreme Court of the United States, which was cited and urged upon the attention of the Court at the trial with W. Gray, differs from the case at bar in some circumstances material to be considered; because these are stated as the grounds of the decision, both in the Circuit Court and upon the writ of error. The evidence in that case proved, sufficiently as it was" supposed, an illicit trade in the sense of trafficking, attempted, if not effected. To this purpose, hovering upon the coast, and irregular conduct in many respects, are spoken of; and a particular stress is laid upon a judicial sentence, establishing the fact of a seizure for illicit trade. The policy of insurance in that case contained, however, an exception of the same import with the limitation of the insurance expressed in the policy now in question; and Chief Justice Marshall, in stating the opinion of the Court, and in reasoning upon the subject in a more general view of it, considers exceptions of illicit trade as capable of a more enlarged exposition than had been necessarily resorted to in deciding the case of Church vs. Hubbard. The exposition is given with great clearness and strength of argument. Its application in the case at bar is the only question that can be made respecting it. And upon the whole, after a full examination of that decision as it is reported, I concur with my brethren in adopting the *107 exposition there given of an exception of illicit trade, and in considering it applicable * and conclusive upon [ * 110 ] the question now to be decided in the case at bar.
What is illicit trade with the Spanish colonists depends upon prohibitions of intercourse enacted by the sovereign, to be enforced in the colonies. There has been no evidence produced in the case at bar, unless the intimations from the viceroy may be regarded as evi fence, that the arrival of a foreign vessel in a Spanish colony, openly destined there for purposes of trade, if that was or should be permitted, is of itself a cause of forfeiture. The Portuguese edict, cited in the case of Church vs. Hubbard, does not import this degree of severity in their prohibitions. But such destination and arrival are of themselves cause of suspicion, and justify a restraint and detention to prevent smuggling and trade; and a seizure in such' a case is a direct and unavoidable consequence of the prohibitions of trade and intercourse; and whether made for an arrival on the coast of a Spanish colony, or for an act of traffic, attempted or accomplished in an illicit manner, is alike within the exception of seizure for illicit trade. Nor is it necessary to this construction that we should understand the voyage or destination as prohibited, or that these are included in the exception under any possible meaning of the word trade; for a seizure to prevent traffic, as well as on suspicion of trafficking, and every legitimate consequence of such seizure, and perhaps we may add, although not necessary to the present decision, even arbitrary acts of the Spanish colonial governments, if assumed to be justified on their parts by the prohibitions of trade and intercourse, are, we think, wfithin the exception of seizure for illicit trade; as much so as the most regular confiscation would be, when enforced for an act of trafficking, illicitly managed with the colonists or natives. The exception extends to every seizure and detention, suggested by the prohibitions of trade and intercourse as the means of enforcing them, and whether of prevention or of punishment for infraction ; and therefore to cases where the charge of illicit trade with the * Spa?i- [*111 ] iards might be ultimo*.sly repelled, and when the property seized might be in consequence acquitted under the circumstances of the particular case.
In the opinion brought in question on this motion, it is supposed, however, that voyages to the Spanish colonies for purposes of trade are ordinarily prohibited; and the opinion was, that a seizure for the voyage or destination, if no charge of illicit trafficking had occurred, was not withdrawn by the exception of illicit trade with the Spaniards, but continued to be a risk insured against; and "for this reason, principally, that the voyage described includes the ports of *108 the Spanish colonies, as a - destination explicitly permitted to the assured ; and the insurance is upon a representation that the vessel is to be without a register, to have goods on board contraband of war; and the assured are also expressly permitted to disguise their vessel, cargo, and voyage, by papers of an illicit character, or simulated. So much may well be understood in “ covering the property under whatever papers the Diana should sail.” Construing these stipulations to be an insurance of a voyage and risk, as to the destination of the vessel and cargo represented to be illicit, against the perils to be so incurred, stipulations not included in the printed forms, but distinctly written and expressed, and, considering the exception relied on for the defendant is not to have a construction which entirely abolishes those stipulations, or renders them nugatory, and that the whole instrument is to be taken together, and that every part is to be preserved, if it may be by a reasonable construction, the inference seemed to be, that the terms “ illicit trade with the Spaniards” had, in the intention of the parties to this instrument, the sense of trafficking after an arrival, or in the course of the voyage, when not permitted, according to the facts supposed in the case of Church vs. Hubbard, upon which that decision rested.
The jury, in' the trial between the plaintiffs and W. Gray, were therefore directed that the voyage and destination of the Diana, and whatever was illicit in them, remained insured [ * 112 ] * against any seizure for that cause. Besides, this contract had been made, in point of time, before the decision in Church vs. Hubbard, or before it was known; and therefore these intentions of the parties might be understood from expressions less cautious and precise than would be required since that decision.
The obvious and most usual sense in which the word trade is employed, is to express traffic, commerce, exchange dealing, not the voyage or destination of a ship, although sometimes the term may be allowed that meaning, when the voyage or destination is named from the use or purpose to which it leads or is designed.
But, upon further examination, I have not found it necessary to adhere to this construction; and I am satisfied that the previous stipulations are not rendered nugatory, but have their full effect in many events that may be supposed; although a prohibited voyage or destination to the Spanish colonies should be understood as withdrawn by the exception. A seizure and detention for conduct illicit by the law of nations in the particulars mentioned, or for a want of papers, or for simulated or double papers, are cases provided for, to which the insurance extends. And if the voyage is *109 insured, the insurers limit their undertaking by rejecting those risks which may be incurred from Sjianisk prohibitions, which include, as we have observed, seizures to prevent illicit traffic, as well as seizures to punish it; and without a critical definition of the word trade, the case at bar seems to be included ; or, at least, the construction suggested of the contract in question between these parties, and the direction to the jury, upon which the verdict against IV. Gray was found, are not to be supported. The defendant therefore is entitled to a new trial, according to the agreement of tie parties in reserving this case, (a)

New trial granted.

 8 Mass. Rep. 385, Higginson & Al. vs. Gray,

 2 Cranch's Rep. 187.

 Smith & Al. vs. The Delaware Ins. Co. 3 Wash. C. C. R. 127. — Smith vs. Delaware Ins. Co. 3 Serg. & R. 82. — Fardell vs. Phoenix Ins. Co. 4 Serg. & Rawl. 29. — Gracie vs. New York Ins. Co. 13 Johns. 161.