LYMAN AND LYMAN *against* THE UNITED INSURANCE COMPANY.

Equity will not interpose to amend a written instrument, (as a policy of insurance,) without the clearest and most satisfactory proof of the mistake, and of the real agreement between the parties, especially where the mistake is denied in the answer.

September 30th.

[ * 631 ]

THE bill was filed to have a policy of insurance corrected and amended. The plaintiffs, in *February*, 1813, were partners in trade, and made the following application to the defendants for insurance: " What will be the premium of insurance on the brig *Union*, at and from this to *Oporto*, with a cargo of corn; at and from *Oporto*, to the *Cape de Verd Islands*, for a cargo of salt; and at and from said Islands to her port of discharge in the *United States, free from British capture?* The said brig will sail under a *Portuguese* royal passport. What return, provided the risk ends at *Oporto?* And, also, what the premium would be, against all risks, the voyage round? The policy, to (the plaintiffs or) whomsoever it may concern. A valued policy. Value 5,000 dollars. *New-York, February* 15*th*, 1813. *J. & E. Lyman.* N. B. The brig *Union* lately belonged to *James Robinson.*" The bill stated that war existed between the *United States* and *Great Britain.* That peace existed 'between *Portugal* and *Great Britain*, and that the *Portuguese royal passport* was intended as a cover against capture by the enemy, the

488

plaintiffs being citizens of the *United States.* That the policy was made out, as the plaintiffs supposed, according to the terms of the representation, and was left with the defendants. That on calling for the policy, about 10 days after the vessel sailed on her voyage, the 24th of *February*, 1813, they discovered that it contained a description of the vessel as *American*, which, they are advised, amounts to a warranty, that she should sail with *American papers.* That the policy was returned to the defendants, with a request that they would alter it, and insert a clause, that the vessel should sail with a *Portuguese royal passport*, but the defendants refused to make any alteration in the policy. The bill prayed that the policy might be amended, so as to contain a clause permitting the vessel to sail with such a passport.

The defendants, in their answer, said, that they knew that the plaintiffs were *American* citizens, and they understood and believed they were owners of the brig, and that she was duly documented as an *American* vessel, and had no idea that the *passport* would be inconsistent with her *American* character; or that it was the intention of the plaintiffs to represent her as *Portuguese*, and as a cover from *capture. That being warranted free from *British* capture, *Great Britain* being the only enemy of the *United States*, any such device, to protect her, was not necessary for the defendants, though it was important that she should not have a document that would give her a national character of a belligerent. That the policy truly expressed the terms of the agreement between the parties, and the defendants meant the vessel should sail as *American*, and with such papers only as an *American* vessel might use. That the plaintiffs asked the defendants, what additional premium they would demand, for altering the policy, so as to insure her, as sailing with *Portuguese papers*, and the defendants answered five per cent., which the plaintiffs refused to give.

The secretary of the defendants said the policy was filled up according to the terms of the written application. At the bottom of the written application, the defendants made the following memorandum: "Free from embargo risk out —five per cent.—Clause No. 2.—Account of themselves, and whom else it may concern."—

*T. A. Emmet*, and *Woodward*, for the plaintiffs.

*S. Jones, jun.*, for the defendants.

The Chancellor. The difficulty in this case arises from the want of the requisite evidence of any agreement of the

1817.

LYMAN
v.
UNITED INS.
Co.

† Ante, p. 585.

[ * 633 ]

parties, different from that contained in the policy. The cases which, treat of this head of equity jurisdiction, require the mistake to be made out in the most clear and decided manner, and to the entire satisfaction of the Court. The authorities were reviewed in the decision in the case of *Gillespie and wife* v. *Moon*,† and a reference was made to the successive opinions of Lord *Hardwicke*, Lord *Thurlow*, and Lord *Eldon*, (1 *Vesey*, 317. 1 *Bro.* 94. 6 *Vesey*, 328.) *in favor of the most demonstrative proof, especially against the answer denying the mistake.

In the present case, we have not any parol proof that the *United Insurance Company* ever did agree to any other contract of insurance than that contained in the policy. The witnesses examined on the part of the plaintiffs, were not present at any conversation or agreement. They give us only general information and belief; and they know nothing of any agreement between the parties, different from that which the policy contains. The only circumstance on which the plaintiffs can place any reliance, to show that the company had agreed to the proposals, in respect to the *Portuguese* passport and *Portuguese* character of the vessel, in other words, to the disguise and deception at which the plaintiffs aimed, is the *memorandum* at the foot of the plaintiffs' proposals. But it appears to me, that this note is far too vague and uncertain to justify any correction of the policy. It was not subscribed by the company, nor by their authority. It appears to be only heads of conversation and inquiry on mere fugitive points, which were lost and merged in the execution of the formal instrument. It was the duty of the plaintiffs to have resorted to that instrument, as soon as it was drawn, to see whether the parties understood each other. There is no evidence that this memorandum was returned by the company, as the *terms* agreed to by them. Not a witness alludes to it. The clerk, who was examined, says, that the policy was filled up according to the terms agreed to by the company, and returned by them; and so says, also, the answer of the secretary to the company. And what were these terms? No one says that the notes at the foot of the proposals were the terms, nor for what purpose they were made. All this is left to conjecture and inference. The notes are not sufficiently full and intelligible to make out any policy, *in extenso*, from them. It does not appear to which alternative part of the proposals they alluded. *The policy itself, to which we are to look for the terms, according to the answers, and to the testimony of *Jones*, the clerk, contained special stipulations; as, for instance, against *American* captures, not mentioned in the proposals, nor al-

[ * 634 ]

490

luded to in the notes, and to which no objection was made by the plaintiffs. To alter a clear written contract of the parties, without any parol proof to warrant the new agreement, and when the charge of mistake is denied in the answer, and denied by a witness present; and to do this upon no other foundation than such an imperfect *memorandum, obscuris vera involvens,* would be destructive to the certainty and safety of written contracts.

There is no case that goes such lengths; no amendment was ever made, without absolute conviction of the truth and precision of the real agreement. Here is no, or, at least, not sufficient, evidence that the defendants ever did agree to any other terms of insurance than those expressed in the policy. The bill must, consequently, be dismissed; and I am willing that it should be without costs, as was done by Lord *Hardwicke,* in one of the cases referred to, on the ground that here may have been a misapprehension between the parties in the formation of their contract.