## Case No. 374.

ANDREWS et al. v. ESSEX FIRE & MARINE INS. CO.

[3 Mason, 6.][1]

Circuit Court, D. Massachusetts. Oct. Term, 1822.

ADMIRALTY JURISDICTION — MARINE INSURANCE— REFORMING POLICY — EQUITY — MISCONDUCT OF MASTER.

1. A policy was underwritten, "1000 dollars on brig Union, and 4000 dollars on effects on board said brig from Salem to port or ports in the West Indies, one or more times for the purpose of selling her outward and procuring a return cargo, and at and from thence to her port of discharge in the United States." The memorandum for insurance contained ·this clause:—"The Union is bound to Kingston, Jamaica: if not allowed to sell there, will proceed to Cuba." At the time of the insurance, both parties supposed the port of Kingston open to American vessels under a proclamation of the governor: and neither contemplated any illicit trade. The Union went to Kingston, supposing the port was open, and was there seized and condemned for the illicit trade. Held, that the underwriters were not liable for the loss— that the omitted clause, if inserted in the policy, would not have altered the nature of the insurance, or liability of the underwriters.

[Cited in Dean v. Equitable Fire Ins. Co., Case No. 3,705.]

2. Held also, that a court of admiralty has jurisdiction over policies as maritime contracts: but not over contracts leading to policies;—that it cannot reform a policy by the antecedent contract;—that this part belongs to a court of equity.

[Cited in The Perseverance. Case No. 11,017; The Tribune. Id. 14,171; Dean v. Bates, Id. 3,704: Gloucester Ins. Co. v. Younger, Id. 5,487: Kynoch v. The S. C. Ives, Case No. 7,958; Deely v. The Ernest and Alice, Id.

3,735; The Star of Hope. Id. 13,313; Oakes v. Richardson, Id. 10,390; The Brothers, 7 Fed. 880; The C. C. Trowbridge. 14 Fed. 876; Wenberg v. Cargo Mineral Phosphate, 15 Fed. 288; The G. Reusens. 23 Fed. 405; Paterson v. Dakin, 31 Fed. 683; Rea v. The Eclipse, 135 U. S. 599, 10 Sup. Ct. 876.]

3. Held also, that the omitted clause was not in the contemplation of both parties a part of the contract to be inserted in the policy; but was a representation of a fact.

[Cited in Dean v. Equitable Fire Ins. Co., Case No. 3,705.]

4. Quaere—If a loss by a peril insured against, occasioned by the misconduct of the master be a loss, for which underwriters are liable.

[5. Cited in Joy v. Allen. Case No. 7,552, and Packard v. The Louisa. Case No. 10,652, to the point that admiralty proceeds rather on equitable than on strict legal principles.]

[6. Cited in Leland v. The Medora, Case No. 8,237, to the point that a contract to buy or build a ship is not a maritime contract; Cunningham v. Hall, Case No. 3,481, to the point that a contract to build a ship is not enforceable in admiralty.]

[7. Cited in Taylor v. Brigham, Case No. 13,781, to the point that the owners are ·liable for the willful and malicious acts of the master, done in the course and scope of his employment.]

In admiralty. This was a libel [by John H. Andrews and another against the Essex Fire & Marine Insurance Company] on a policy of insurance, underwritten by the respondents for the plaintiffs, on the 12th of January, 1819, as follows, viz. "the sum of 1000 dollars on the brig Union and appurtenances; also, 4000 dollars on effects on board said brig, from Salem to port or ports in the West Indies, one or more times, for the purpose of selling her outward and procuring a return cargo, and at and from thence to her port of discharge in the United States." The libel charges that a clause in the agreement on which the policy was underwritten, was omitted by mistake, and declares upon the policy as reformed. A total loss is alleged of vessel and cargo in the course of the voyage, by capture and seizure under the authority of the king of Great Britain and Ireland. The facts of the case were, that the plaintiffs, being owners of the Union and her cargo, were about to send her on a voyage to the island of Cuba, and on the 12th of January, 1819, when she was ready to sail on the voyage, a paragraph appeared in the newspapers, stating that a committee of the legislature of Jamaica had reported that the November storm had destroyed the principal articles for the labouring classes in the western parishes, and recommended that the governor be requested to open the ports of the island to all nations for the importation of those articles of provisions required to support the population generally, and in return, to allow payment in produce or otherwise; but that they had not heard that the Duke of Manchester (the governor) had acted upon it. In consequence of this information (which was known to both parties), the plaintiffs altered their voyage, and

[1][Reported by William P. Mason, Esq.]

made application in the evening of the same day to the respondents for insurance by the following memorandum. "$3000 on brig Union and appurtenances, $8000 on effects on board said brig, Allen Putnam master, from Salem to port or ports in the West Indies, one or more times, for the purpose of selling outward and procuring a return cargo, and at and from thence to port of discharge in the United States; and what return if said vessel trades to but one port and arrives safe without loss? The Union is bound to Kingston, Jamaica; if not allowed to sell there, will proceed to Cuba." There were afterwards added the words, "2 years old, sheathed last voyage, 129 tons." The memorandum was laid before the president and directors on the same evening, who agreed to underwrite a policy for four per cent. Before the proposition was accepted by the plaintiffs, Mr. Shepherd came to the office, and informed the secretary, that he wished insurance only for $1000 on the vessel, and $4000 on the cargo, because he expected to get it for a less premium elsewhere; and the secretary then wrote upon the memorandum, "agreed for $1000 on vessel, and $4000 on effects as above," which Mr. Shepherd signed for himself and Mr. Andrews. The act of the secretary was confirmed by the president, and the policy was made out in the terms already stated, omitting the clause:—"The Union is bound to Kingston, Jamaica—if not allowed to trade there will proceed to Cuba." The policy as made out, was received by the plaintiffs without objection, and the usual premium note was given. By the public by-laws of the corporation "the president and directors consider themselves holden on a marine policy, from the time a verbal agreement is made between the president and the person applying for insurance. The president in all cases, where the person applying for insurance is unable to wait for the completion of his papers, will cause a memorandum of the agreement to be made and signed by the person applying for insurance." The brig sailed on the voyage, and having spoken with a pilot near Morant Point (Jamaica), who, upon inquiry, stated that the trade was open for Americans, the master concluded to go directly into the port of Kingston. Soon after his arrival in port, a boat came alongside, from which he learned that the port was not open, and that it was necessary for him to represent that he came into port in distress. He accordingly did this; but the vessel and cargo were immediately afterwards seized, and the master still insisting, upon the trial in the vice-admiralty court, that the case was one of real distress, there was a decree of condemnation pronounced of both. From this decree there was an appeal to the high court of admiralty, which is still pending. It was agreed on both sides that there was no intention of illicit trade by the owners on this voyage, but that it was undertaken solely upon the expectation that the trade was or would be, on arrival at Jamaica, open and free. It was farther in evidence that the present respondents never underwrote any risks upon voyages in illicit trade, and that this was the general custom of incorporated insurance offices. The plaintiffs contended, that they were entitled to answer for a total loss under all the circumstances of the case, the loss having been by a risk contemplated by the policy. They insisted in the first place, that the clause of the memorandum, to which reference has been made, was omitted by mistake, and constituted a part of the contract of insurance, and that they were entitled to have the policy reformed by the court so as to include that clause; and that if so reformed, the risk would be clearly covered by the policy. They insisted in the next place, that even without such reformation of the policy, the legal result was the same; and that the nature of the voyage being made known to the underwriters at the time of the policy, they were bound to the same extent, as if it were expressly stated upon the face of the policy.

On the other hand the underwriters explicitly denied all these positions; and contended that the loss was a loss by illicit trade, which neither in law, was insured, nor contemplated, in fact, by the parties to be insured. And farther, that if this ground should fail, the loss was occasioned by the fault and gross misconduct of the master in setting up a false and fraudulent pretence of distress, as the cause of going into the port of Kingston.

Webster & Saltonstall, for libellants.
Prescott & Nicholls, for respondents.

Before STORY, Circuit Justice, and DAVIS, District Judge.

STORY, Circuit Justice. There cannot at the present day be any serious doubt that a court of equity has authority to reform a contract, where there has been an omission of a material stipulation by mistake. And a policy of insurance is just as much within the reach of the principle, as any other written contract. Graves v. Boston Marine Ins. Co., 2 Cranch, [6 U. S.] 419; Henkle v. Royal Exch. Assur. Co., 1 Ves. Sr. 317; Townshend v. Stangroom, 6 Ves. 328, 333; Motteux v. Governor of London Assur. Co., 1 Atk. 545; Ramsbottom v. Gosden, 1 Ves. & B. 165; Watt v. Grove, 2 Sch. & L. 492; Gillespie v. Moon, 2 Johns. Ch. 585; Marsh. Ins. b. 1, c. 8, § 4, and notes; Hogan v. Delaware Ins. Co., [Case No. 6,582;] Condy's Marsh. Ins. 345a, note; Lyman v. United Ins. Co., 2 Johns. Ch. 630. But a court of equity ought to be extremely cautious in the exercise of such an authority, seeing that it trenches upon one of the most salutary rules of evidence, that parol evidence ought not to be admitted to vary a written instrument. It ought, therefore, in all cases to withhold

its aid, where the mistake is not made out by the clearest evidence according to the understanding of both parties, and upon testimony entirely exact and satisfactory. There is less danger where the instrument is to be reformed by reference to a preliminary written contract, which it was designed to execute. But even here there is abundant room for caution, since the parties may have varied their intentions or the clause may not have been originally understood by either party to go to the extent now required. And these considerations acquire additional force, where circumstances have occurred in the intermediate time, which give an intense importance to the asserted mistake. Under these limitations the doctrine of courts of equity on this subject does not seem at variance with general convenience or justice.

In the present case the memorandum signed by the plaintiffs after it was agreed to by the president of the company, constituted a good and valid agreement binding upon the parties. The by laws of the company make it in such a case expressly obligatory upon them. And if there be an omission in the policy of any clause constituting a part of that agreement, it ought in equity and good conscience to be corrected. It is not sufficient for the underwriters, that they suppose the words do not cover a particular risk, for they may mistake the law, and their mistake shall not prejudice the other party. When once the contract is agreed to, whatever that contract, by a just and reasonable interpretation, includes, the underwriters are bound to insert in the policy, and if they omit to do it the assured has a right to insist upon a perfect conformity to the original proposition and agreement. The case under such circumstances is clearly distinguishable from the cases referred to at the bar [Lyman v. United Ins. Co.,] 2 Johns. Ch. 630; [Vandervoort v. Smith,] 2 Caines, 155, where the proposals for insurance never assumed any obligatory shape, and could therefore be considered in no other light, than as proposals, which were merged on the execution of the formal instrument. Here the proposal was agreed to and formed the basis for the execution of the policy; and there is no pretence to say that it was ever afterwards varied by the parties. The true question then is, whether the omitted clause in the contemplation of both the parties was to be inserted in the policy. I say both the parties, because it must be a joint intent and assent. It is not sufficient that one of the parties intended it, if it was not agreed to by the other. If the clause was to be inserted in the policy, then it is no answer on the part of the underwriters, that they may possibly be liable for the risk of illicit trade against the known general usage and designs of the corporation. They must take the legal consequences of all that stands in the text of their contract. And the opinions of the very respectable gentlemen, who have testified in this case, demonstrate that the general understanding of merchants is in perfect conformity to the principles of law on this subject. We must then resort in the first place to the memorandum itself to ascertain what was the contract to be executed. It is not pretended that every thing contained in the memorandum was to be inserted in the policy. It is perfectly notorious that proposals of this nature often contain remarks, representations, and queries for the information and guidance of the underwriters, which cannot by any reasonable construction be supposed proper for insertion in the policy. In many instances the insertion would be absurd, and in some might be repugnant to the obvious intent of the parties in their final act. This very memorandum illustrates the truth of these observations; for it contains particulars of inquiry and information, which neither party now supposes to belong to the policy. It is not sufficient therefore to show that a clause is in the memorandum, to justify its insertion in the policy, unless from its nature and object it clearly formed a part of the contract. A clause may in the event become material and decisive of a right if inserted, which may nevertheless, at the time of the proposal, not have been contemplated by either party as a part of the policy. It might make all the difference between a representation and a warranty, a difference in many cases of the most serious importance.

The memorandum in the present case contains a perfect description of the ship, the master, and the voyage intended to be insured; and the policy follows this description with the most minute care. It was drawn up according to the understanding of the insurance company as a full description of the risk; and it was received without objection by the plaintiffs. No application was made to alter it, until after the loss occurred, and then the materiality of the clause now in question became apparent. It is argued that being material, the plaintiffs are now entitled to have it inserted, because the parties must be presumed to have contemplated the insertion of every thing material to the risk. That is true in a limited sense; but not universally. If the clause be material in the event, it must still be seen whether in fact it constituted, in the understanding of the parties, a part of the original contract. If there had been an omission of a descriptive part of the voyage, or of the name of one of the owners, it would have been perfectly clear that these must have constituted a necessary part of the policy upon the true import of the memorandum, and therefore the presumption of mistake would be irresistible. But if the clause be a mere statement of a fact, which in its place in the memorandum may be either construed a mere representation, or a modification of the terms of the contract, it stands equivocal, and the like presumption cannot prevail.

The underwriters may, as in the present case, understand it in one sense and the insured in another; and it is the presumed assent of both which gives it the effect of a contract. The acts of the parties under such circumstances become very material; and their acquiescence in one mode of execution of the policy would go far to show that it was the true mode. The clause in the memorandum is in these words: "The Union is bound to Kingston, Jamaica; if not allowed to sell there, will proceed to Cuba." It is certainly in terms a representation of a fact. Is it such a fact as belonged to the policy? That the clause was not intended to abridge the general liberty given in the description of the voyage is conceded on all sides. The brig was still to be at liberty to go to any other port or ports in the West Indies, otherwise the general description would be useless. It would be absurd to ask or give general liberty to all West India ports, and in the same breath to tie up the adventure to Kingston and Cuba. Was it designed as a warranty that the brig should go to those ports? This can scarcely now be contended, for the underwriters did not claim its insertion in this view; and the owners by reserving the general liberty of the West Indies may fairly be presumed to have reserved the liberty of changing honestly the direct voyage. Can it then be considered in any other view than as a representation of the present intention of the owners, to guard against any objection for concealment or misrepresentation? The plaintiffs contend that its insertion was necessary and intended by them because it would cover the risk of the contingency of the voyage to Jamaica being lawful. The defendants deny that they ever contemplated such a risk under the contract. The burthen of proof then rests on the plaintiffs; and if the language of the memorandum be not unambiguous, if the construction be not necessary, but doubtful; if the acts of the parties have left the presumption against the plaintiffs, a court of equity ought to be very slow in undertaking to reform the policy upon conjecture.

It is material here to consider that the answer of the company explicitly denies any intention to insert the clause, or to become liable for the risk of illicit trade. The latter might be true, and yet if they had in fact bound themselves to such a risk, their mistake of the law would not help them. But the circumstance of the denial is not insignificant, as it stands confirmed by their acts. If their practice is not to insure illicit voyages, and the policy conforms to this practice, it would require strong evidence to force upon them such a risk by a construction of a memorandum clause, which justly might admit of various interpretations, and might fairly be understood in different ways. The premium in a case of this nature is certainly not decisive either way; but if it be the usual premium for the common risks, is affords some presumption that the underwriters did not contemplate unusual risks; and in this view it may aid in the construction of doubtful words.

The rule of courts of equity is not to reform a policy, unless the mistake be made out by the clearest evidence. The cases of Henkle v. Royal Exch. Assur. Co., 1 Ves. Sr. 317, before Lord Hardwicke; of Lyman v. United Ins. Co., 2 Johns. Ch. 630, before Mr. Chancellor Kent; of Hogan v. Delaware Ins. Co., [Case No. 6,582,] Condy's Marsh. Ins. 345a, note, Whart. Dig. 320, before Mr. Justice Washington; and of Graves v. Boston Marine Ins. Co., 2 Cranch, [6 U. S.] 419, 442, before the supreme court of the United States,—are conclusive upon this point. The asserted omission in the present case is indeed incontestable upon the evidence; but whether it was a part of the contract omitted by mistake is, to say the least of it, extremely questionable. I do not mean to say that the plaintiffs did not act with the most perfect fairness, or did not contemplate an indemnity against the very loss, which has occurred. I believe they did; and that whatever security was to be obtained by a policy conforming to the substance of the memorandum they meant to provide for. The difficulty lies not in the honesty or reasonableness of their intentions, but in giving effect to those intentions, if they were not communicated in such a manner to the underwriters, in the memorandum, as to lead them to the conclusion, that the omitted clause was a part of the proposed contract. Whatever might be my opinion as a private man upon the propriety of inserting the clause, as a judge sitting in equity I should have extreme difficulty in saying that the case afforded plenary evidence of any mistake which the court was called upon to rectify. The terms of the memorandum are not necessarily matters of contract, and if they are ambiguous in their import or object, the parties must be left to their rights upon the policy as executed. Perhaps it is the less necessary to dwell on this point, because I am of opinion that if there be a mistake in the policy, this is not the tribunal to correct it. The authority over this subject is generally confided, and most conveniently, to courts of equity. The rules of evidence and the modes of relief in these courts are admirably adapted to cases of this nature; and it appears to me that the jurisdiction exclusively attaches these. To be sure in a certain sense, and in the exercise of their general jurisdiction, courts of admiralty may be properly said to be courts of equity, that is, courts proceeding ex aequo et bono, and not confined to the narrow notions of the common law. But courts of admiralty may be properly said to tion to administer relief as courts of equity. They cannot entertain an original bill or libel for specific performance, or to correct a mistake, or to grant relief against a fraud, though they may perhaps sometimes, like

courts of law, perform what may be deemed analogous functions. They may give the same benefit, as if there were no fraud or mistake, or omission of performance; but this can be in a few cases only, which fall, in all their circumstances, completely within their general jurisdiction. Courts of admiralty, in my view, have jurisdiction over maritime contracts when executed, but not over contracts leading to the execution of maritime contracts. If there were a contract to build a ship, or to sign a shipping paper, or to execute a bottomry bond, and the party refused to perform it, it has never been my impression that the enforcement of such a contract belonged to the admiralty. I know of no authority pointing to such a conclusion, and I must say I should be sorry to find one; for it would lead to the utter confusion of jurisdictions. But if the contract be an executed maritime contract, the jurisdiction attaches; and the admiralty may then administer relief upon that contract according to equity and good conscience. The law looks to the proximate and not to the remote cause as the source of jurisdiction; and deals with it only when it has assumed its final shape as a maritime contract. It has been said that the memorandum in the present case is an executed maritime contract, equivalent to a policy; but I understand it to be nothing more than an agreement for a policy; and if no policy had been executed this court as a court of admiralty would not have had jurisdiction to enforce it. We are not at liberty in such cases to consider that done which ought to have been done.

If therefore any thing in point of law, material to the plaintiffs' case, depends upon this clause, and a mistake has occurred in omitting it, my judgment is that a court of admiralty is incapable of administering the proper relief. The remedy lies at common law, for damages for nonperformance of the original agreement, or in equity, for a specific performance by reforming the policy. In the present suit I can only deal with the policy, as it stands. And this leads me to the other question made at the bar, which has always appeared to me to be the turning point of the cause, and to be in itself of very great difficulty and nicety. If in the investigation of it I could derive any consolation from full and learned arguments, I should be bound to make the acknowledgement, that nothing has been omitted. Still I cannot say, that I have arrived at a conclusion without very considerable hesitation.

It is perfectly settled that the underwriters, by the general terms of the policy, are not liable for any loss arising from foreign illicit trade, unless the policy be underwritten with the full knowledge on their part that such was the object of the voyage. This is the general doctrine of foreign maritime writers, and has been recognized in the fullest manner by the common law tribunals. 2 Valin, lib. 3, tit. 6, art. 49, pp. 127, 128, 130; Cleirac Le Guidon, c. 2, arts. 2, 5, pp. 233, 234; Santema, p. 4, note 17; Id. p. 5, note 10; Straccha, Assecur, Gloss. 5, p. 23; Loccenius, lib. 2, c. 5, note 7, p. 981; Roccus, Anec. note 21; 1 Emerig. c. 8, § 5, p. 212; Targa, c. 71; Molloy, bk. 2, c. 7, § 15, p. 288; Marsh, Ins. bk. 1, c. 3, § 1, p. 60; Anon., 2 Vern. 176; Planche v. Fletcher, 1 Doug. 251; Gardiner v. Smith, 1 Johns. Cas. 141; Richardson v. Maine Fire & Marine Ins. Co., 6 Mass. 102; Parker v. Jones, 13 Mass. 173; Pollock v. Babcock, 6 Mass. 234. The reason of the doctrine is obvious. If the voyage be lawful, the underwriters cannot be presumed to undertake risks occasioned by a violation of law by the owner or his agents; and in such case the law, notwithstanding the general terms of the policy, will exempt them from such losses. But if the trade is known to be illicit, and can be carried on only by smuggling, and the underwriters do not make an exception of the risk of illicit trade, there is the strongest presumption of their intention to take it. Their knowledge does not indeed add new terms to the policy; but it takes away any pretence for saying that the loss by seizure, which is, an "arrest, restraint, or detainment of the sovereign" within the policy, was not contemplated by the parties. In the present case it is clear that no illicit trade was intended to be covered by the policy, for the trade was not supposed to be prohibited at the time. It is true that it was well known that Jamaica, as a colony of Great Britain, was restricted from foreign trade by the British colonial system. But it was as well known that authority had been given to the king to open the colonial ports under certain circumstances. The Adams, Edw. Adm. 289, 303; 46 Geo. III. c. 3; The Vixen, 1 Dod. 136. And this authority was supposed still in existence and might be exercised and promulgated through the colonial governor. The intelligence in newspapers without doubt led both parties to the belief, that this authority had then been, or would, before the arrival of the vessel, be rightfully exercised; and both parties proceeded in the insurance upon the ground that the trade would be lawful. In point of fact the port was not opened, and immediately upon the brig's arrival in port, she was seized and condemned for an illegal importation of goods, contrary to the navigation acts of Great Britain. These acts make it illegal to import any goods into any of the colonies except in ships, British built, and owned and navigated by British seamen to the extent of three-fourths of the crew. 12 Car. II. c. 18; 7 & 8 Wm. III. c. 22. The libel against the Union and cargo proceeds upon these acts for the forfeiture. And it is perfectly clear by the whole current of authority that a voluntary arrival in port with a cargo constitutes an importation, within the purview of these and other revenue acts. The Eleanor. Edw. Adm. 135, 160; The Adams, Edw. Adm. 289, 298; The Sarah,

1 Dods. 77; Hale, Cust.; Harg. Law Tracts, 213; The Paisley, 1 Edw. Adm. Append. E. 18.

There can then be no doubt that the arrival at Jamaica being voluntary, and not from necessity or stress of weather, brought the case within the prohibitions of these laws; and that consequently the condemnation might be rightfully made upon this general ground, although the mistake of the master as to the trade being lawful, was the sole cause of his going into port. The question then is narrowed down to this consideration, whether the knowledge of the underwriters of the destination to Jamaica, under the circumstances, makes them liable for a loss by illicit trade, occasioned by mistake and ignorance and against the intentions of the owners. If the trade to Jamaica was prohibited universally, and this fact was understood by the underwriters, they would have been held to the risk of illicit trade. If the trade had been previously open, and was closed during the voyage, they might have been exonerated from that risk. The trade was not open at the time, but the parties contemplated that it would be during the voyage; and then comes the point, whether the underwriters took upon themselves the chance of its being open, and of course the risk of its being illicit.

It cannot be denied that the general words of the policy coupled with the knowledge of the actual destination fully authorized the voyage to Jamaica; as fully, indeed, in my judgment, as if the words had been inserted in the policy. And the case is put in the strongest manner, when it is asked what would be the effect, if the policy had been for a voyage in terms to Jamaica. I do not know, that this would relieve us from a single difficulty, for the same question would still recur, whether under the circumstances it covered the risk of an illicit entry into the ports of that island.

There is not a single case where the underwriters have been held responsible for losses of this nature, unless they have in express terms, or by fair implication, assumed it. If the present policy had contained an express exception of losses by illicit trade, a condemnation for proceeding to Jamaica, although there had been no actual trading there, would have been within the exception. The case of Church v. Hubbart, 2 Cranch, [6 U. S.] 187, 232, is an authority directly in point; and that has been followed in the supreme court of Massachusetts. Higginson v. Pomeroy, 11 Mass. 104. See, also, Smith v. Delaware Ins. Co., 7 Cranch, [11 U. S.] 434. So that where the risk of illicit trade is not designed to be taken, the presumption is that the risk of proceeding to the port for this purpose is not taken. Is there any difference between a risk excluded by express words and a risk excluded by fair implication? If the underwriters are not presumed to take the risk of illicit trade, are they to be presumed from the same facts to take the risk of an illegal arrival or importation?

It is argued that the underwriters having insured the voyage to Jamaica must be presumed to warrant a right of entry into the port at least for the purpose of inquiry. That if they authorize the going to the port, they warrant by implication that the voyage to the port is lawful and thus assume the risk of seizure on this account. If this were so, the argument would be exceedingly strong in favour of the plaintiffs. But the authorities do not seem to speak pointedly to such a conclusion. The fair result of the cases in England and in Massachusetts is, that a denial of entry or an interdiction of commerce at the port of destination is not a risk within the common policy. Hadkinson v. Robinson, 3 Bos. & P. 388; Ludbock v. Rowcroft, 5 Esp. 50; Parkin v. Tunno, 11 East, 22; Richardson v. Maine Ins. Co., 6 Mass. 102, 115. The decisions in New York do indeed maintain a different doctrine. See Suydam v. Marine Ins. Co., 1 Johns. 181; Schmidt v. United Ins. Co., Id. 249; Craig v. United Ins. Co., 6 Johns. 226. The supreme court of the United States has held that a restraint by blockade after the commencement of the voyage is a peril within the policy. Olivera v. Union Ins. Co., 3 Wheat. 183. And it was also decided, in conformity with the English cases, that the breaking up of the voyage for fear of capture, because the port of destination was shut, is not a peril within the policy. It was there said, "that the underwriter does not warrant that the vessel shall have a right to trade at the port of destination; but only that notwithstanding the perils insured against, the vessel shall proceed to such port." Smith v. Universal Ins. Co., 6 Wheat. 176. But this language was used in a case where the underwriters were expressly exempted from losses by illicit trade; so that it is in no degree different from that held in Suydam v. Marine Ins. Co., in New York. 1 Johns. 181. The precise point whether seizure for going into an interdicted port, which it is supposed might be open, is a risk within the common policy, does not appear to have arisen in England. In Hadkinson v. Robinson, 3 Bos. & P. 388, Lord Alvanley admitted, that if the vessel had proceeded to Naples and had been actually seized, the loss might have been within the policy. Chief Justice Parsons, in Richardson v. Maine Ins. Co., 6 Mass. 102, 115, said, "If new regulations, made during the voyage, should render the trade illicit, and the master on his arrival should violate those regulations, and for that cause the property insured should be confiscated, the assurer will not be answerable, unless he had insured against seizure for illicit trade." This language may perhaps cover the case, where the master ignorantly violates the new regulations; but it does not seem addressed to a case, where

there is a present interdiction and an expected opening of the port during the voyage, contemplated by both parties at the time of the insurance. In Pollock v. Babcock, Id. 235, the court decided that if a vessel be insured to an interdicted port, and be seized at an intermediate port (to which she had gone from necessity during the voyage,) on account of her ·destination, she not having in fact carried on, or attempted to carry on, an illicit trade, it is a loss within the common policy. The court seemed to consider that the going to the interdicted port was lawful, though it was unlawful to trade there. But it decided that if it was unlawful to go to the port, and that fact was unknown to both parties, still the insured was entitled to recover. It is somewhat singular that it was not decided whether, from the facts of the case, the underwriter did not take the risk of illicit trade by implication, for the report states that trade was generally known to be prohibited with the port. If they did take the risk, then the loss was clearly within the policy. If they did not, it is somewhat difficult to reconcile this case with others on the same subject. The case, so far as it goes, does seem to countenance the doctrine that on a voyage supposed to be lawful by the parties, but not in fact so, the underwriters are liable for a confiscation, for sailing on the voyage. In Parker v. Jones, 13 Mass. 173, both parties supposed the trade to be lawful to Curracoa; but the property was condemned for a violation of the statute of 43 Geo. III. regulating that trade, and the court held the underwriters not liable for the loss, upon the ground that they had not taken the risk of illicit trade. Yet there it might have been said that as the vessel was insured to Curracoa, there was an implied undertaking that the property insured might be carried there, and that the risk of its lawful importation was assumed by the underwriters.

Not being able to find the doctrine established that an insurance to a port includes, on the part of the underwriters, the risk of going into the port in violation of law, except where the risk of prohibited trade is assumed. I do not feel at liberty to incorporate it into the construction of the policy. The true principle seems to me to be this, that the policy guarantees an indemnity in going to the port against all losses by the perils insured against; and unless the peril of illicit entry at the port be contemplated as one of the risks insured against, the underwriters are not held. The risk of illicit entry is not presumed to be taken where the trade is not known to be prohibited and expected · during the voyage to remain so. If both parties contemplate the trade as free, the policy covers only the ordinary risks. It is only when the trade is not expected to be carried on except by violation of the laws, that the underwriters are

presumed to take that risk upon themselves. The chance of illicit trade is never assumed, unless it is clearly intended to be carried on.

It is asked, if the contingency of illicit trade was not contemplated in this case, what reason was there to insert the clause in the memorandum, that the brig was bound to Jamaica. My answer is, that it might be material information to the underwriters. They might wish to know the intended voyage; and if it were to an interdicted port, it might, even with the exception of prohibited trade, be a risk, which they might not choose to assume. But the same memorandum informed the underwriters that if the brig was not allowed to sell at Jamaica, she was to go to Cuba. This is a plain declaration, that the owners did not mean to force an illicit trade · at Jamaica, or an illicit entry there. It was equivalent on their part to a notice. that the brig, though bound to a British colony, was intended to sail only on a lawful voyage, and that the insurance was to cover it as such. And if the owners had concealed the fact of a destination to Jamaica from the underwriters, as the general words of the policy would lead them to presume the voyage was to lawful ports only, it might have been questionable, if the concealment would not have avoided the policy. At all events. it would certainly have done so, if there would have been any increase of premium or risk. The owners in this respect conducted themselves with the most entire good faith and frankness.

What would have been the effect if the memorandum had only said, "The Union is bound to Kingston, Jamaica," I pretend not to decide. It is supposed in the argument. that it would then have clearly covered the risk of an illicit entry. But is this certain? If the parties contemplated only a lawful voyage, and the information led them to the belief. that such a voyage was lawful, could the underwriters be presumed to take the risk of its possible illegality? The law does not say that the underwriter takes the risk of illicit trade, where he by mistake supposes it lawful, but where the trade being known to be illicit, he cannot be presumed from the nature of the voyage to have had any other object in contemplation. Admitting even that the underwriters took the risk of the vessel's going to Jamaica to make inquiries, it is not shown that this was in point of law an illicit act. The very statute on which this condemnation was founded is for an illegal importation of goods, not for an inquiry before arrival in port. There is no British statute within my knowledge that makes it a cause of forfeiture to lie off a colonial port. or to make inquiries, if near the port, whether it be open or not. The statutes of Car. II. and Wm. III. apply only to importations consummated by a voluntary arrival in port. Unless therefore an arrival in port were necessary for the purpose of inquiry, which can

scarcely be pretended, the vessel might have gone to, though not into the port of Kingston, and have been entirely protected by law. See The Sarah, 1 Dod. 79. The master himself proceeded upon this supposition. He made inquiries off the port, and was told that the port was open; and this information, given falsely by design or mistake, was the real cause of his going into port.

It is certainly true that both parties must have contemplated that the ports of Jamaica might not be open, for the memorandum provides in that case for a voyage to another island. But the effect of this is to show, not that the underwriters meant to take the risk of the voyage, being illicit, but that they meant to provide another voyage, if it should turn out to be illicit. They engage that the vessel may go to Jamaica, if allowed, if not, then she may go to Cuba. In a case of this peculiar cast I have searched the foreign jurists with a hope of meeting with some principles to illustrate it. But I cannot say that the search has resulted in anything satisfactory. Valin, after remarking, that illicit trade is not covered by a policy, where the underwriter is not informed of the risk at the time of the insurance, says, that his opinion is the same, in cases where the insured is himself ignorant that the trade is prohibited. 2 Valin, lib. 3, tit. 6, Assur. art. 49, pp. 127, 128.

Upon the whole my opinion is, after considerable hesitation, that the present policy, under all the circumstances of this case, did not cover the loss by the condemnation of the property for an illicit importation into Jamaica.

There is another point in the cause, upon which it may be thought necessary, after the full argument at the bar, that I should express an opinion. It is, that the loss was occasioned by the misconduct of the master in setting up a false pretence of distress, and that if the truth of the case had been stated, no condemnation could have been decreed. Whether in any case the underwriters are liable for a loss by any of the perils in the policy, the remote cause of which is the negligence and misconduct of the master and mariners not amounting to barratry, is a vexed question, upon which opposite opinions have been expressed by very distinguished courts. In England the point has recently received after a solemn discussion a decision in the affirmative, (Busk v. Royal Exch. Assur. Co., 2 Barn. & Ald. 73; Walker v. Maitland, 5 Barn. & Ald. 171; Mal. Law Merch. 111; Law v. Hollingsworth, 7 Durn. & E. [Term R.] 160; Park Ins. (6th Ed.) c. 3, p. 83; Carruthers v. Sydebotham, 4 Maule & S. 86; Marsh. Ins. c. 12, § 6, p. 519; Id. § 3, p. 494;) though it is not difficult to perceive, that the former opinions inclined the other way. In New York the point has been unequivocally settled in the negative, (Vos v. United Ins. Co., 2 Johns. Cas. 180; Grim v. Phoenix Ins. Co., 13 Johns. 451;) and that appears to be the leading opinion also in Massachusetts. Cleveland v. Union Ins. Co., 8 Mass. 308, 320; Coffin v. Newburyport Marine Ins. Co., 9 Mass. 446. The foreign jurists generally concur in exempting the underwriters from losses by the fault of the master, unless that risk is expressly assumed. 2 Valin, lib. 3, tit. 6, Assur. art. 27, p. 79; Poth. Assur. note 64; 1 Emerigon, c. 12, § 17, p. 434; and see [Busk v. Royal Exch. Assur. Co.,] 2 Barn. & Ald. 80, 81; Miller, Ins. 136, 138, etc.; Carevegis Dis. 142, notes 26, 27. In this diversity of doctrine I desire to suspend my own judgment, until the question is absolutely necessary to be decided. In the present case I am not satisfied that the loss was occasioned by the misconduct of the master. The libel and condemnation are for an illegal importation; and it is said, that if the arrival had been for the mere purpose of inquiry and had been so asserted, it would have been no breach of the statutes restricting the colonial trade. But it appears to me, that a voluntary importation of the goods, though under mistake or for the purpose of inquiry, is within the prohibitions of these statutes. The case of The Sarah, decided by Lord Stowell, (then Sir William Scott), is directly in point, (1 Dod. 79; The Vixen, Id. 136;) and no judge ever understood the colonial laws better or administered them with more lenity. I am therefore spared the necessity of looking at the more general question, since whatever may be the extent of the misconduct of the master, it is not shown to have been the efficient cause of this loss.

As however upon a principal point, the reformation of the policy, my opinion proceeds upon a defect of jurisdiction in the court, I think the plaintiffs are entitled to have that question litigated in another forum, and shall therefore decree that the libel be dismissed without prejudice to any other suit.